John LANIGAN, Sr., Plaintiff–Appellant,

v.

VILLAGE OF EAST HAZEL CREST, ILLINOIS, Officer Robert Wasek, Chief Ray Robertson, et al., Defendants–Appellees.

No. 96–1442.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 9, 1996.

Decided March 28, 1997.

S. Ira Miller, Chicago, IL, argued for Plaintiff–Appellant.

Frank Calabrese (argued), Peter J. Magnani, and Thomas L. Buck, Magnani & Buck, Chicago, IL, for Defendants–Appellees.

Before BAUER, ROVNER, and DIANE P. WOOD, Circuit Judges.

BAUER, Circuit Judge.

John Lanigan filed a civil rights action pursuant to 42 U.S.C. § 1983 alleging that his rights under the Fourth, Fifth and Fourteenth Amendments were violated during a routine traffic stop. The complaint named Officer R. Wasek, Sergeant Charles A. Krane, and Chief Ray Robertson as defendants, both individually and in their official capacities. The complaint also named the Village of East Hazel Crest ("the Village") as a defendant, alleging that the Village has an inadequate policy relating to the conduct, supervision and training of police officers. The district court granted the defendants' motion to dismiss pursuant to Rule 12(b)(6), finding that Lanigan had failed to set forth a violation of the Constitution or of federal laws and that the defendants were entitled to qualified immunity. We reverse in part and affirm in part.

## BACKGROUND

For purposes of our review of the district court's dismissal pursuant to Rule 12(b)(6), we accept the factual allegations in the complaint as true and draw all reasonable inferences from those facts in favor of Lanigan. *Zemke v. City of Chicago*, 100 F.3d 511, 513 (7th Cir.1996) (citation omitted). The facts below are taken only from the allegations in Lanigan's complaint.

I. *Facts*

This case arises from an altercation between John Lanigan and three members of the Village of East Hazel Crest police force during a routine traffic stop of Lanigan's car. The complaint alleges that on March 4, 1994, at approximately 8:35 in the morning, 67–year–old John Lanigan turned left from a southbound street to an eastbound street in the Village immediately after a stoplight

changed from red to green. Lanigan did not wait for the intersection to clear before making the turn because he was waved on by an oncoming northbound driver who was also waiting for the light to change. Officer Robert Wasek, a member of the Village police force, pulled Lanigan over into a parking lot, blocking Lanigan's car with his squad car. Officer Wasek demanded Lanigan's driver's license, but Lanigan was unable to produce it. Lanigan asked why Officer Wasek had pulled him over, but Officer Wasek would not engage in conversation until Lanigan produced his license. Officer Wasek eventually told Lanigan that Lanigan had made an improper left turn. Lanigan then "advised" Officer Wasek "that a more courteous professional manner of the presentation would have been to advise of the infraction first." Officer Wasek did not appreciate the advice. He "shouted" at Lanigan, "[D]on't tell me how to handle my job." Lanigan replied that he had not made an improper left turn and that his wallet containing his license was at his workplace. Lanigan asked to be allowed to leave to get his wallet and to use the restroom because he had recently had surgery for prostate cancer and he had a problem controlling his bladder. Officer Wasek refused, and instead asked for information so he could check Lanigan's driver's license. At some point during the encounter, Lanigan relieved himself into a bladder control pad he was wearing.

Officer Wasek consulted his officers' manual during the entire incident and while he was writing the ticket. The complaint alleges that he did this "apparently for instructions as to what to do." While Officer Wasek was writing the ticket, Lanigan turned his car around to facilitate a quick exit once the ticket was issued. While turning his car, the bumper of Lanigan's car hit the tire of Officer Wasek's squad car. Lanigan got out of his car. Officer Wasek, angry about the contact between the cars, got out of the squad car, advised Lanigan that he had "crashed" into the squad car, and called the dispatcher for back-up cars to assist him. Lanigan got back into his car, intending to use his car phone to call his workplace for help, but he was too frightened to turn on his engine to use the phone because he thought Officer Wasek might "shoot him."

Chief Robertson and Sergeant Krane arrived on the scene in two additional squad cars. Officer Wasek "shouted," "[H]e crashed into the side of my car." Lanigan asked who Officer Wasek's superior was, to which Chief Robertson answered, "I am officer Wasek's superior, I am the Chief of Police and you are the one with the problem." Sergeant Krane directed Lanigan to stay in his car while the three officers examined Officer Wasek's squad car for damage. Lanigan got out of his car and wiped the side of the squad car with his hand to show the officers that there was only salt discoloration and no damage to the squad car. Lanigan then advised the officers that they should either show him "some damage or lock him up."

The complaint alleges that Sergeant Krane "then violently poking and pushing the plaintiff stated 'we know what to do with you.' " Lanigan told Sergeant Krane, "[K]eep your hands off of me." According to the complaint, Lanigan "looked to the Chief for some assistance or some supervision of his apparently unsupervised employees and the Chief exhibited no desire to exert any supervision." Chief Robertson and Lanigan argued over whether there was any damage to the squad car, at which time, the complaint alleges, Lanigan was totally brow beaten and subdued.

Officer Wasek refused to set his pad containing the bonding documents on a car in order to make it easier for Lanigan to sign. He told Lanigan: "[Y]ou will do what you are told and sign it here the way I want it." The complaint further alleges that Officer Wasek moved the pad around as Lanigan was trying to fill it out, deliberately making it difficult for Lanigan to sign, and that Chief Robertson and Sergeant Krane "enjoyed Lanigan's discomfiture and said and did nothing." Lanigan eventually was ticketed for failing to yield while making a left turn. He was found not guilty of the offense.

## II. *Procedural History*

On May 6, 1994, Lanigan filed a civil rights action pursuant to 42 U.S.C. § 1983, alleging

that his rights under the Fourth, Fifth and Fourteenth Amendments had been violated during the traffic stop. Lanigan named Officer R. Wasek, Sergeant Charles A. Krane,[1] and Chief Ray Robertson as defendants, both individually and in their official capacities. The complaint alleges that Lanigan suffered bodily injury, his diaper leaked, suffered humiliation, physical and emotional distress and will continue to so suffer in the future. The complaint also named the Village of East Hazel Crest as a defendant as a result of its policies relating to the conduct of, supervision of and training of its policemen in enforcing traffic and related laws. Lanigan asks for $50,000 in compensatory and punitive damages, plus attorney's fees and costs as a result of the incident.

On May 18, 1994, before setting any discovery schedule, the district court asked the parties to brief the issue of the officers' qualified immunity. On July 6, 1994, Officer Wasek, Chief Robertson and the Village filed an answer to the complaint, but did not assert a qualified immunity defense. On November 14, 1994, the defendants filed a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure asserting that Lanigan's complaint failed to state a claim upon which relief could be granted.[2] The motion to dismiss also contended that all three individual defendants were entitled to qualified immunity.

The district court granted the motion to dismiss as to all the defendants on May 16, 1995. The district court found that, given the totality of the circumstances, the complaint did not state a claim against either Officer Wasek or Sergeant Krane, and that, therefore, Chief Robertson could not be liable under a supervision theory.[3] The district court further found that the Village could not be liable because Lanigan had failed to plead that the Village had a policy of infringing on civil rights. Finally, the district court found that all three individual defendants were shielded from liability by qualified immunity because their conduct was not unreasonable in light of clearly established law. The district court's decision was based solely on the

---

1. The original complaint named an unknown "John Doe," but an amended complaint filed on September 16, 1994 replaced "John Doe" with Sergeant Charles A. Krane.

2. On February 22, 1995, after he was named in and served with the amended complaint, Sergeant Krane also filed a 12(b)(6) motion to dismiss. His motion contained substantially the same arguments as that of the other defendants, and we consider the motions together.
 In his response to the motion to dismiss, Lanigan argued that the defendants' motion could not be styled as a 12(b)(6) motion because Officer Wasek, Chief Robertson and the Village had already jointly filed an answer at that point. The defendants responded, and we agree, that the motion should, instead, be viewed as a 12(c) motion for judgment on the pleadings. This is immaterial for our purposes, however, because as a matter of motions practice, a 12(b)(6) motion to dismiss made after an answer has been filed can be considered as a 12(c) motion for judgment on the pleadings and can be evaluated under the same standard of review as a 12(b)(6) motion. *Republic Steel Corp. v. Pennsylvania Engineering Corp.*, 785 F.2d 174, 182 (7th Cir.1986).

3. The district court's dismissal erroneously stated that Lanigan had been found *guilty* of the charge of making an improper left turn. The district court corrected this error in its January 26, 1996 order denying the motion to reconsider. *Lanigan v. Village of East Hazel Crest*, 913 F.Supp. 1202, 1206 n. 1 (N.D.Ill.1996). The order denying the motion to reconsider otherwise relied on the identical reasoning and contained the same language as the order granting the motion to dismiss.

The dismissal (and the denial of the motion to reconsider) noted that Lanigan did not allege that he had been injured by Sergeant Krane's poke and push. The district court correctly noted that an excessive force claim does not require an injury, and therefore that Lanigan need not have been injured to have an excessive force claim. *Id.* at 1209 (citing *Lester v. City of Chicago*, 830 F.2d 706 (7th Cir.1987)); *see also Rambo v. Daley*, 68 F.3d 203, 207 n. 2 (7th Cir.1995). The district court also noted that the fact that Lanigan was not injured gave weight to the assertion that there was not excessive force. 913 F.Supp. at 1209 (citing *Meyer v. Robinson*, 992 F.2d 734 (7th Cir.1993)).

Lanigan erroneously frames the issue on review as whether "the plaintiff [must] plead actual physical injuries in order to support a civil rights claim for excessive force ... against police officers and their municipal employer." That issue, however, is not relevant to our review because the district court did not find the lack of injury to be paramount to its finding that there was no civil rights violation. Rather, the district court found the lack of injury to be *only a factor* in its review, leading the court to conclude that, given the totality of the circumstances, Lanigan had not stated a claim for a violation of federal law or of the Constitution. *Id.*

pleadings. The district court denied a motion to reconsider on January 1, 1996. On appeal, Lanigan argues that the district court jumped the gun by dismissing the complaint solely on the pleadings. Lanigan argues primarily that, without conducting more discovery, the district court could not have found as a matter of law that the officers did not use excessive force against him. We affirm in part and reverse in part.

## ANALYSIS

### I. Legal Principles Governing § 1983 Liability and Qualified Immunity

We review de novo both the district court's dismissal of a complaint pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, *Flenner v. Sheahan,* 107 F.3d 459, 461 (7th Cir.1997), and the district court's determination of whether a law enforcement officer is entitled to qualified immunity. *Forman v. Richmond Police Dept.,* 104 F.3d 950, 956–57 (7th Cir.1997). As with dismissals pursuant to Rule 12(b)(6), we will affirm the district court's 12(c) dismissal only if it appears beyond doubt that the plaintiff can prove no facts sufficient to support his claim for relief. *Flenner,* 107 F.3d at 461; *Frey v. Bank One,* 91 F.3d 45, 46 (7th Cir.1996) (citations omitted), *cert. denied,* —— U.S. ——, 117 S.Ct. 954, 136 L.Ed.2d 841 (1997).

Liability under § 1983 requires proof that the defendants were acting under color of state law and that the defendants' conduct violated the plaintiff's rights, privileges, or immunities secured by the Constitution or laws of the United States. *Yang v. Hardin,* 37 F.3d 282, 284 (7th Cir.1994) (citations omitted); *see also Kernats v. O'Sullivan,* 35 F.3d 1171, 1175 (7th Cir.1994). The parties in this case do not dispute that the defendant officers were acting under color of state law during the incident. Rather, the parties dispute whether the facts alleged in the complaint set forth a deprivation of Lanigan's constitutional rights. "Of course, every official abuse of power, even if unreasonable, unjustified, or outrageous, does not rise to the level of a federal constitutional deprivation." *Kernats,* 35 F.3d at 1175. "Some such conduct may simply violate state tort

law or indeed may be perfectly legal, though unseemly and reprehensible." *Id.*

The first step in analyzing a § 1983 claim is to identify the specific constitutional right allegedly infringed. *Id.* (citations omitted). Lanigan's complaint makes conclusory allegations that each individual defendant and the Village deprived him of his Fourth, Fifth and Fourteenth Amendment rights. The complaint does not specifically indicate which conduct by which defendant violated which right. The complaint has four counts, one count referring to each defendant. Each count referring to an individual defendant has a heading reading: "Deprivation of Civil Rights by Assault and Battery." Clearly, there is no cause of action under § 1983 for simple tort law duties-of-care. Rather, we garner from the complaint and from Lanigan's counsel's statements during oral argument that Lanigan feels he was unreasonably seized in violation of the Fourth Amendment, that Sergeant Krane used excessive force during the seizure, and that Chief Robertson was deliberately indifferent to the alleged use of excessive force.

 After resolution of the legal question of whether Lanigan has sufficiently alleged a violation of his constitutional rights, an analysis of the officials' possible qualified immunity is appropriate. *Sivard v. Pulaski County,* 17 F.3d 185, 189 (7th Cir.1994) (citing *Siegert v. Gilley,* 500 U.S. 226, 231–32, 111 S.Ct. 1789, 1792–93, 114 L.Ed.2d 277 (1991)). Qualified immunity is an affirmative defense which must be pleaded. *Id.* (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982)). Contrary to Lanigan's belief, qualified immunity may be raised in a motion to dismiss, but at that stage, we consider only the facts alleged in the complaint, which we are obligated to accept as true. *Kernats,* 35 F.3d at 1175–76.

Under the doctrine of qualified immunity, "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct.

2727, 2738, 73 L.Ed.2d 396 (1982) (emphasis added). "The contours of a 'clearly established' right 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Sivard,* 17 F.3d at 189 (citing *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). Thus, the determination of whether public officials are entitled to qualified immunity is an objective one. *Triad Associates, Inc. v. Robinson,* 10 F.3d 492, 496 (7th Cir.1993). This objective standard "protects the public interest in deterrence of and compensation for an official's unlawful conduct while safeguarding the official's ability to make difficult decisions 'with independence and without fear of consequences.'" *Kernats,* 35 F.3d at 1176 (citing *Harlow,* 457 U.S. at 819, 102 S.Ct. at 2739). We are concerned with "whether a reasonable police officer could have believed [the conduct was] constitutional, 'in light of clearly established law and the information [he] possessed' at the time." *Frazell v. Flanigan,* 102 F.3d 877, 886 (7th Cir.1996) (citing *Anderson,* 483 U.S. at 639, 641, 107 S.Ct. at 3038, 3040). "The level of generality at which the relevant legal rule is to be identified may not be so abstract that the rule of qualified immunity is converted into a rule of virtually unqualified liability." *Sivard,* 17 F.3d at 189 (citing *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039). "The 'very action in question' need not have previously been held unlawful, but, in the light of pre-existing law, the unlawfulness of the action must be apparent." *Id.* (citing *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039.)

Once an officer raises the qualified immunity defense, this Court uses a two-step analysis to determine whether an officer is entitled to qualified immunity: (1) whether the alleged conduct sets out a constitutional violation; and (2) whether the constitutional standards were clearly established at the time of the violation. *Young v. Murphy,* 90 F.3d 1225, 1234 (7th Cir.1996) (citations omitted); *Donovan v. City of Milwaukee,* 17 F.3d 944, 947 (7th Cir.1994); *see also Siegert v. Gilley,* 500 U.S. 226, 231–32, 111 S.Ct. 1789, 1792–93, 114 L.Ed.2d 277 (1991). This is normally a two-step analysis, but "where a plaintiff's complaint, even when accepted as true, [does] not state a cognizable violation of constitutional rights, then the plaintiff's claim fails." *Young,* 90 F.3d at 1234 (citations and internal quotation omitted).

In their motion to dismiss, the defendants point out that our Court has also approached the qualified immunity analysis in a slightly different way. The defendants cite *Fittanto v. Children's Advocacy Ctr.,* which they believe used an alternative qualified immunity analysis. 836 F.Supp. 1406, 1412 (N.D.Ill. 1993) (citing *McDonnell v. Cournia,* 990 F.2d 963, 968 (7th Cir.1993)). *McDonnell v. Cournia* set forth the test for qualified immunity as follows:

> First, the plaintiff must show that the law was clearly established when the challenged conduct occurred. In this Circuit, we ask "whether the law was clear in relation to the specific facts confronting the public official when he or she acted." Second, we evaluate the objective legal reasonableness of the defendants' conduct. We inquire whether reasonably competent officials would agree on the application of the clearly established right to a given set of facts.

990 F.2d at 968 (internal citations omitted). Although the defendants are perhaps correct that our qualified immunity analyses may seem incongruous, *McDonnell* is not necessarily inconsistent with *Young.* The formulation set forth in *McDonnell* merely elaborates on the second prong of the *Young* test. It clarifies that, for qualified immunity purposes, the relevant period to examine is *when challenged conduct occurs,* not when a lawsuit is filed. *McDonnell,* then, underscores the importance of evaluating the specific facts confronting an officer at the time of the challenged conduct—an analysis dictated by *Anderson v. Creighton.*

In this case, the district court stated that before it could even address the issue of qualified immunity, it had to address whether Lanigan asserted a violation of a constitutional right at all. *See Siegert,* 500 U.S. at 232, 111 S.Ct. at 1793 ("A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant

acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all."). The district court found, in the first instance, that the complaint did not assert a violation of a constitutional right as to any defendant. The court additionally found that in any case, the defendants, in their individual capacities, were shielded by qualified immunity. As to each defendant, then, we will first examine the allegations in the complaint to determine whether any violation of Lanigan's constitutional rights has been asserted.

## II. *Officer Robert Wasek*

■ The complaint, as well as a statement by Lanigan's counsel at oral argument, suggest to us that Lanigan believes Officer Wasek arrested him without probable cause and therefore violated his constitutional rights. Because of the very specific facts alleged in the complaint, this is the only possible violation of rights by Officer Wasek that Lanigan could allege.[4] Lanigan cites no statutory or common law authority for his position that Officer Wasek did not have probable cause to stop him, nor are we able to unearth any. Lanigan merely asserts repeatedly that he was found not guilty in traffic court of the charge of making an improper left turn. However, the issue, as we have said before, is not whether Lanigan was convicted in traffic court, but, rather, whether there was probable cause to believe that a traffic law had been violated. *United States v. Smith*, 80 F.3d 215, 219 (7th Cir.1996); *see also Whren v. United States*, —— U.S. ——, ——, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996) ("[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."). Our cases also state that "the Fourth Amendment is no bar to the police 'stopping and questioning motorists when they witness or suspect a violation of traffic laws, even if the offense is a minor one.'" *United States v. Tipton*, 3 F.3d 1119, 1122

(7th Cir.1993) (citing *United States v. Mitchell*, 951 F.2d 1291, 1295 (D.C.Cir.1991), *cert. denied*, 504 U.S. 924, 112 S.Ct. 1976, 118 L.Ed.2d 576 (1992)). The resolution of the question of whether probable cause exists typically falls within the province of the jury, but "a conclusion that probable cause existed as a matter of law is appropriate when there is no room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Sheik–Abdi v. McClellan*, 37 F.3d 1240, 1246 (7th Cir. 1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 937, 130 L.Ed.2d 882 (1995) (citations omitted).

The Supreme Court set forth the degree of suspicion required under the Fourth Amendment for three categories of police-citizen encounters:

> The first category is an arrest, for which the Fourth Amendment requires that police have probable cause to believe a person has committed or is committing a crime. The second category is an investigatory stop, which is limited to a brief, non-intrusive detention. This is also a Fourth Amendment "seizure," but the officer need only have specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime. The third category involves no restraint on the citizen's liberty, and is characterized by an officer seeking the citizen's voluntary cooperation through noncoercive questioning. This is not a "seizure" within the meaning of the Fourth Amendment.

*United States v. Rodriguez*, 69 F.3d 136, 141 (7th Cir.1995) (citations omitted). The encounter in this case falls into the second category—a brief, non-intrusive detention. Based on the specific facts pled in the complaint, we believe Officer Wasek had specific and articulable facts sufficient to give rise to a reasonable suspicion that Lanigan made an improper left turn. Officer Wasek pulled Lanigan over after Lanigan made the left

---

4. On appeal, Lanigan's brief contains a one-sentence allegation that Officer Wasek "was acting in concert with [Sergeant] Krane and was responsible for [Sergeant] Krane's use of excessive force." Because we are reviewing the district court's dismissal on the pleadings, we only look to the allegations contained therein and view them as true. Even if we were to consider the conspiracy allegation Lanigan now makes in his appellate brief, we would regard it as having no merit.

turn without yielding to the oncoming driver. Officer Wasek then issued a traffic ticket for this conduct.

■ The relevant Illinois traffic law provides:

> The driver of a vehicle intending to turn to the left within an intersection ... shall yield the right-of-way to any vehicle approaching from the opposite direction which is so close as to constitute an immediate hazard, but said driver, having so yielded may proceed at such time as a safe interval occurs.

625 ILL.COMP.STAT. 5/11–902. Officer Wasek properly exercised his discretionary right to pull Lanigan over for failing to comply with this statute. Although Lanigan was eventually found not guilty of the violation, that does not diminish the fact that Officer Wasek had a reasonable suspicion that Lanigan had violated the statute. Moreover, once Officer Wasek stopped Lanigan, he was certainly authorized to ask Lanigan to produce his driver's license. When Lanigan was unable to produce his license, Officer Wasek had probable cause to believe that Lanigan had violated another traffic law requiring him to carry his license, and to detain Lanigan while he checked out Lanigan's information. *See* 625 ILL.COMP.STAT. 5/6–101 (requiring a driver's license or permit for all persons driving motor vehicles); 625 ILL.COMP.STAT. 5/6–112 (requiring drivers' licenses to be in drivers' possession when operating motor vehicles and to be displayed upon demand); *see also People v. Flowers,* 111 Ill.App.3d 348, 354, 67 Ill.Dec. 203, 208, 444 N.E.2d 242, 247 (1982) (finding reasonable basis for stopping car when brake lights were not operating and for arresting driver for failing to produce license); *People v. Morrison,* 57 Ill.App.3d 468, 472–73, 15 Ill.Dec. 174, 176, 373 N.E.2d 520, 522 (1978) (finding probable cause to believe defendant committed a misdemeanor by failing to produce license after being stopped for traffic offense). Under Illinois law, Officer Wasek could have done *more* than merely issue a ticket in this situation— he was actually authorized to arrest Lanigan for driving without his license. *See United States v. Fiala,* 929 F.2d 285, 288 (7th Cir. 1991) (citing *People v. Hampton,* 96 Ill.

App.3d 728, 52 Ill.Dec. 330, 333, 422 N.E.2d 11, 14 (1981) and *People v. Garcia,* 43 Ill. App.3d 757, 2 Ill.Dec. 213, 357 N.E.2d 190 (1976)).

■ The complaint does not allege that Officer Wasek used excessive force against Lanigan, that he performed an illegal search, or that he falsely arrested him. As the district court pointed out, the complaint at best alleges that Officer Wasek was grumpy and discourteous when issuing the ticket. We do not find either Officer Wasek's unpleasant demeanor or his refusal to set his pad on a car for Lanigan to sign to be acts of constitutional dimension. Rather, we believe that Officer Wasek had probable cause to stop Lanigan, and we conclude, as the district court did, that Lanigan's fact-specific complaint does not assert a violation of any constitutional right by Officer Wasek. Lanigan did not have to plead with specificity to meet the requirements of Rule 8(a). He did allege particulars, however, and as to Officer Wasek, those particulars show that he has no claim. Lanigan, therefore, has pleaded himself out of court in terms of his claims against Officer Wasek. *See, e.g., Thomas v. Farley,* 31 F.3d 557, 558–59 (7th Cir.1994). We therefore have no cause to consider whether Officer Wasek is entitled to qualified immunity.

### III. *Sergeant Charles A. Krane*

■ The complaint alleges that during the routine stop, Sergeant Krane administered one violent poke and push, and said to Lanigan, "[W]e know what to do with you." Lanigan believes this conduct amounts to a use of excessive force by Sergeant Krane. Use of excessive force by police officers during an investigatory stop constitutes a Fourth Amendment violation that is actionable under § 1983. *Clash v. Beatty,* 77 F.3d 1045, 1047 (7th Cir.1996) (citing *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 1870–71, 104 L.Ed.2d 443 (1989)). "Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons ...

against unreasonable ... seizures.'" *Graham,* 490 U.S. at 394, 109 S.Ct. at 1871.

We therefore analyze claims that a law enforcement officer used excessive force in the course of an arrest, investigatory stop or other seizure under the Fourth Amendment and its "reasonableness" standard. *Graham,* 490 U.S. at 395, 109 S.Ct. at 1871; *Frazell v. Flanigan,* 102 F.3d 877, 882 (7th Cir.1996). This requires us to determine whether "the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham,* 490 U.S. at 397, 109 S.Ct. at 1872. The court must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake. *Graham,* 490 U.S. at 396, 109 S.Ct. at 1871 (citations and internal quotations omitted); *Frazell,* 102 F.3d at 882. In analyzing excessive force claims under the Fourth Amendment, although the reasonableness test is "not capable of precise definition or mechanical application," we evaluate "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396, 109 S.Ct. at 1872; *Clash,* 77 F.3d at 1047.

We must, in this case, evaluate whether Sergeant Krane used reasonable force in light of the particular circumstances he faced. A law enforcement officer's right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham,* 490 U.S. at 396, 109 S.Ct. at 1872; *Frazell,* 102 F.3d at 882. However, as Lanigan correctly points out, "police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever." *Clash,* 77 F.3d at 1048; *see also McDonald v. Haskins,* 966 F.2d 292 (7th Cir.1992).

In *Graham v. Connor,* the Supreme Court evaluated the "reasonableness" of particular uses of force and stated:

Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

490 U.S. at 396–97, 109 S.Ct. at 1872 (internal quotation and citations omitted). We look at the circumstances the officer was confronted with "not through 'the 20/20 vision of hindsight,' but through the more immediate perspective of a reasonable officer on the scene." *Frazell,* 102 F.3d at 883 (citing *Graham,* 490 U.S. at 396, 109 S.Ct. at 1872).

Our central inquiry in this case is whether the amount of force Sergeant Krane used against Lanigan was "objectively reasonable" in light of the particular circumstances he faced. Taking the complaint as true, we know that the force Sergeant Krane used consisted of "one violent push and poke" and a contemporaneous statement. We also know that there appeared to be a rising level of confrontation between Lanigan and the officers. As the district court noted: "That Lanigan felt he needed to call for help and that he feared he might be shot reveals much about the rising level of the confrontation." However, although Lanigan's fears do reveal the existence of a rising confrontation, we do not believe we know enough about the level of confrontation to make an informed judgment about the objective reasonableness of Krane's use of force. Because of the limited notice pleading standard in Rule 8(a) of the Federal Rules of Civil Procedure, we cannot say that Lanigan has failed to allege a possible constitutional violation by Sergeant Krane. Although we recognize that Krane's intent or motivation is not to be considered, we also feel that the statements or depositions of Lanigan, Sergeant Krane, Officer Wasek and Chief Robertson would illuminate the situation so that the district court might be in a better position to evaluate the situation as a whole to see if Sergeant Krane behaved in an objectively reasonable manner.

Specifically, more facts indicating the level to which the confrontation escalated are necessary for the district court to determine the concomitant amount of force that was necessary in the situation. Dismissing Sergeant Krane at this point is premature. Determining whether Sergeant Krane's actions were reasonable, in light of the totality of the circumstances, is a task the district court should perform with the benefit of statements from the witnesses.

We do not suggest that Lanigan has failed in any respect in pleading, and we are mindful that the Supreme Court has not indicated that heightened pleading is appropriate in the civil rights context in cases involving individual government officials. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 166–67, 113 S.Ct. 1160, 1162–63, 122 L.Ed.2d 517 (1993). We also caution that we are not setting forth a *per se* rule that § 1983 excessive force/objective unreasonableness determinations may never be made solely on the pleadings. We merely find that when the level to which a situation has escalated is uncertain, and, like here, it cannot be ascertained from the pleadings, the need for physical force and the amount of force necessary to quell a citizen who is not responding to a show of authority is a question that requires more development. Our conclusion is only that the district court needs more facts to determine whether Sergeant Krane's actions were objectively reasonable in terms of the Fourth Amendment in light of the particular situation he faced. We are therefore unable to evaluate whether Sergeant Krane's actions constituted a violation of a clearly established constitutional right.

We recognize the fact that Sergeant Krane may be entitled to the shield of qualified immunity. We have not discovered any law existing on March 4, 1994 that clearly established a right to be free from a discourteous police officer or a right to be free from one non-injurious poke or push when a citizen fails to abide by police instructions. On the other hand, the witness statements might indicate that the confrontation did escalate beyond the detailed facts in the complaint. At that point, Lanigan would bear the burden of showing that Sergeant Krane's use of force violated a clearly established constitutional right. *Clash,* 77 F.3d at 1047. Lanigan could do this either (1) by showing a clearly analogous case that established a right to be free from the type of force Sergeant Krane used against him or (2) by showing that the force was so plainly excessive that, as an objective matter, Sergeant Krane would have been on notice that he was violating the Fourth Amendment. *See id.* at 1048 (citation omitted). If Lanigan is unable to meet this burden, Sergeant Krane will be entitled to qualified immunity. If Lanigan can meet his burden, the district court must then evaluate the objective legal reasonableness of Sergeant Krane's conduct based on the specific situation Sergeant Krane was faced with on March 4, 1994. *See McDonnell v. Cournia,* 990 F.2d 963, 968 (7th Cir.1993); *see also Frazell,* 102 F.3d at 886 ("We are concerned ... with whether a reasonable police officer could have believed that [the officer's] conduct was constitutional 'in light of clearly established law and the information [he] possessed' at the time.") (citing *Anderson v. Creighton,* 483 U.S. 635, 639, 641, 107 S.Ct. 3034, 3038, 3040, 97 L.Ed.2d 523 (1987)).

As we have indicated, we currently use an objective approach for evaluating both the immunity issue and the merits under the Fourth Amendment. *See Frazell,* 102 F.3d at 886–87. In *Frazell,* a jury had determined that officers used objectively unreasonable force under the circumstances they faced. We noted that a number of circuits have determined that a jury's verdict on the Fourth Amendment inquiry necessarily decides the immunity issue, "because both questions turn on whether the officer's conduct was objectively reasonable under the circumstances." *Id.* at 886 (citations omitted). Those circuits reason that "once a jury has determined that the officer's conduct was objectively unreasonable, that conclusion necessarily resolves for immunity purposes whether a reasonable officer could have believed that his conduct was lawful." *Id.* at 886–87 (collecting cases). We indicated that our decision in *Titran v. Ackman,* 893 F.2d 145, 146 (7th Cir.1990) also took our circuit in that direction. *Id.* at 887 ("[W]e intimated

there [in *Titran*] that because an individual's right under the Fourth Amendment 'to be free of excessive force during an arrest has long been established,' a finding that too much force was used 'logically dispose[s]' of the immunity question.") *Frazell* and *Titran* thus suggest that once the use of force has been found excessive, a qualified immunity defense normally will be unavailable. In theory, there may be a case in which an officer, despite his unreasonable use of force, could still claim the shield of qualified immunity based on the unsettled state of the law at the time he acted. We do not view *Frazell* as closing the door on that possibility altogether; *Frazell*, after all, found the qualified immunity defense "effectively foreclose[d]" based on "the circumstances of [that] case," which included a fully developed factual record. 102 F.3d at 887. We do not have anything like such a record here. Because we find that more facts are needed to evaluate whether excessive force was used, we necessarily must find that more facts are needed to determine whether immunity is available.

## IV. *Chief Ray Robertson*

The district court dismissed the claim against Chief Robertson because it found that Officer Wasek and Sergeant Krane had not engaged in conduct depriving Lanigan of his constitutional rights, and, in turn, that Chief Robertson could not have acquiesced in such a deprivation. Although we agree with the district court that Officer Wasek's alleged conduct does not set forth a constitutional violation, we indicated above that more facts are required to evaluate Sergeant Krane's conduct. We therefore cannot follow the district court's logic. Instead, we must independently assess whether the alleged conduct of Chief Robertson was violative of any federal laws or the Constitution.

■ The doctrine of *respondeat superior* cannot be used to impose § 1983 liability on a supervisor for the conduct of a subordinate violating a plaintiff's constitutional rights. *Kernats*, 35 F.3d at 1182 (citing *Monell v. Dept. of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978)). Supervisory liability will be found, however,

if the supervisor, with knowledge of the subordinate's conduct, approves of the conduct and the basis for it. *Id.* (citations omitted). Our cases acknowledge that to be liable for the conduct of subordinates, a supervisor must be personally involved in that conduct. *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir.1988) (citations omitted); *see also Wolf–Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir.1983) (citation omitted) ("[A]n *individual* cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation"). In *Jones*, we clarified what we meant by being "personally involved" in conduct by saying that "supervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable, because negligence is no longer culpable under § 1983." *Jones*, 856 F.2d at 992. We further indicated in *Jones* that gross negligence is also not enough to impose supervisory liability. Rather, "supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either *knowingly* or with *deliberate, reckless indifference.*" *Id.* at 992–93 (emphasis added).

■ However, we also have said that "[o]missions as well as actions may violate civil rights" and that "under certain circumstances a state actor's failure to intervene renders him or her culpable under § 1983." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). Yang set forth the requirements for this type of liability:

An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring.

*Id.* (citing *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir.1994)); *see also Thompson v. Boggs*, 33 F.3d 847, 857 (7th Cir.1994), *cert.*

*denied,* —— U.S. ——, 115 S.Ct. 1692, 131 L.Ed.2d 556 (1995). This test applies equally to supervisory and nonsupervisory officers. *Yang,* 37 F.3d at 285. Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise. *Anderson,* 17 F.3d at 557.

Under this test, even if Sergeant Krane deprived Lanigan of his constitutional rights by using excessive force, that, in itself, is not enough to hold Chief Robertson liable as Krane's supervisor. *See Starzenski v. City of Elkhart,* 87 F.3d 872, 879 (7th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 683, 136 L.Ed.2d 608 (1997). Chief Robertson can only be held liable if he knew Sergeant Krane was using excessive force on Lanigan or if he was deliberately indifferent to Sergeant Krane's actions *and* if Chief Robertson had a realistic opportunity to intervene to prevent the use of excessive force.

■ In our independent review of the complaint, taking the facts in the light most favorable to Lanigan, we believe that Chief Robertson did not act knowingly or with reckless, deliberate disregard of Krane's actions. According to the fact-specific allegations in the complaint, Krane's conduct consisted only of one poke and push and a contemporaneous statement. Based on the specificity in the complaint, we do not find the contact between Sergeant Krane and Lanigan to be so prolonged that Chief Robertson could know or be deliberately indifferent to Sergeant Krane's actions. Chief Robertson could not have undertaken any action to "un-do" any alleged constitutional violation by Sergeant Krane. Most importantly, we believe Chief Robertson did not have a realistic opportunity to intervene in any situation between Lanigan and Sergeant Krane. Af-

ter the alleged poke and push were completed, Chief Robertson certainly could have intervened had he felt that further physical force might ensue between Sergeant Krane and Lanigan. The complaint does not allege, however, any further acts of physical force by Sergeant Krane beyond the alleged push and poke, or any threats of further force by Sergeant Krane. We do not believe that Chief Robertson was forced to throw himself between Sergeant Krane's finger and Lanigan's body to interrupt the imminent poke in order to avoid liability under § 1983. We believe that given the detailed allegations in the complaint, Lanigan has pleaded himself out of court in terms of his claim against Chief Robertson. *See Thomas v. Farley,* 31 F.3d 557, 558–59 (7th Cir.1994). As with Officer Wasek, we have no occasion to consider whether Chief Robertson is entitled to qualified immunity.

## V. *Village of East Hazel Crest*

■ Lanigan's complaint also alleges that the Village and the officers in their official capacities deprived Lanigan of his rights under the Fourth, Fifth and Fourteenth Amendments as a result of the Village's policy of inadequately supervising and training its police officers.[5] In *Monell v. Dept. of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978), the Supreme Court held that Congress intended municipalities and other local government units to be "persons" within the purview of § 1983, and thus amenable to suit under § 1983. The Court concluded that municipalities could not be liable under § 1983 on a *respondeat superior* theory, but could be liable if action pursuant to an official policy or custom of the municipality causes a constitutional tort. *Id.* at 690–91, 98 S.Ct. at 2035–36; *Sivard v. Pulaski County,* 17 F.3d 185, 188 (7th Cir.1994). "[W]hen execution of a

---

5. Our discussion of the municipal liability claim pertains both to Lanigan's claim against the Village and to his claims against Officer Wasek, Sergeant Krane and Chief Robertson in their official capacities. "An official capacity suit against a municipal official is merely another way of asserting a claim against the municipality." *Gibson v. City of Chicago,* 910 F.2d 1510, 1519 n. 14 (7th Cir.1990); *see also Kentucky v.*

*Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (holding that a defendant can only be sued in his official capacity under § 1983 if he acted pursuant to an official policy or custom in causing the constitutional injury); *Rascon v. Hardiman,* 803 F.2d 269, 274 (7th Cir.1986) (finding that an action against an individual defendant in his official capacity operates as a claim against the government entity itself).

government's policy or custom, whether made by its lawmakers, or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury ... the government as an entity is responsible under § 1983." *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037–38. However, "[b]oilerplate allegations of a municipal policy, entirely lacking in any factual support that a city policy does exist, are insufficient." *Sivard,* 17 F.3d at 188 (citation omitted). There must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989); *Starzenski,* 87 F.3d at 879. "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy...." *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985).

In *City of Canton v. Harris,* the Supreme Court held that "inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." 489 U.S. at 388, 109 S.Ct. at 1204. The Court stated: "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* at 389, 109 S.Ct. at 1205. The Court elaborated:

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city

can reasonably be said to have been deliberately indifferent to the need.

*Id.* at 390, 109 S.Ct. at 1205.

We are mindful that our conventional system of notice pleading applies to § 1983 actions against municipalities and that there is no heightened pleading standard in these cases. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 165, 113 S.Ct. 1160, 1161–62, 122 L.Ed.2d 517 (1993).[6] Accordingly, we recently reversed a district court for "jump[ing] the gun" when it dismissed a § 1983 action against the City of Chicago pursuant to Rule 12(b)(6). *See Sledd v. Linsday,* 102 F.3d 282, 288 (7th Cir.1996). In *Sledd,* the complaint alleged that the City of Chicago maintained official policies and customs which violated the plaintiff's rights. The district court granted the City of Chicago's motion to dismiss for failure to state a claim upon which relief could be granted. We reversed the district court's dismissal because we believed the district court had "jumped the gun" in light of the complaint's detailed allegations. We heeded the Supreme Court's instruction in *Leatherman* that plaintiffs need only comply with conventional notice pleading in § 1983 cases against municipalities. We recalled that plaintiffs should be allowed to go forward if relief could be granted under any set of facts that could be proved consistent with the allegations in the complaint. We therefore concluded that it was error to dismiss the claim solely on the pleadings and indicated that the parties should be entitled to develop a record suitable for a summary judgment motion, at which point the district court would be "in a far better position to see if Sledd [could] back up his allegations with anything that entitles him to a trial." *Id.* at 289.

In comparison to the allegations against the Village in this case, the complaint in *Sledd* was extremely detailed. It specifically alleged: (1) that the City failed to properly supervise, discipline, transfer, counsel and

**6.** Lanigan argues that *Leatherman* applies to all his claims against all defendants and prevents a disposition on the pleadings. However, Lanigan is incorrect because *Leatherman* only held that there is no heightened pleading standard in civil rights cases pursuant to § 1983 *against munici-* *palities. Leatherman,* 507 U.S. at 164, 113 S.Ct. at 1161. In *Leatherman,* the Supreme Court expressly reserved the question of whether a heightened pleading standard would apply in cases involving individual government officials. *Id.* at 166–67, 113 S.Ct. at 1162.

otherwise control officers; (2) that the City and the Police Department maintained a code of silence whereby officers would not testify against other officers who committed unconstitutional acts; (3) how the code of silence worked; and (4) how the plaintiff had been injured by the code of silence. *Id.* at 287. Moreover, the *Sledd* complaint included statistics about the number of excessive force complaints filed against the Chicago Police Department, the number of complaints which were investigated, and the number which the Police Department's Office of Professional Standards believed had merit. *Id.* The complaint in *Sledd* clearly contained more than boilerplate allegations.

The complaint in this case, on the other hand, merely consists of boilerplate allegations against the Village. It alleges:

> [A]s demonstrated by the actions of Chief Robertson, Sergeant Charles A. Krane and Officer R. Wasek, it is the *policy* of the Village of East Hazel Crest to put police officers on the street acting under color of state law without adequate training or supervision. That not only did the Village of East Hazel Crest allow Officer Wasek to operate as a police officer without adequate training or supervision but apparently Chief Robertson and Sergeant Charles A. Krane are allowed to act without training or supervision.

(emphasis added). The only factual allegation supporting the claim is that during the issuance of the ticket, Officer Wasek "kept referring to and reading from a book apparently for instructions on what to do." We find no constitutional infirmity in the fact that Officer Wasek consulted his reference manual even if, taking the facts in the complaint in the light most favorable to Lanigan, Officer Wasek did so to ensure proper ticketing procedures were used. This allegation does not support either the notion that Officer Wasek was inadequately trained or the notion that the Village had a policy of inadequately training its officers. We also recognize that Lanigan does not allege any factual

support such as the data in *Sledd* to support the notion that this policy existed.

However, based on the allegations, the district court erred when it said "Lanigan *did not plead* that the Village of East Hazel Crest had such a policy of infringing on civil rights." Although the allegations do not come close to the level of specificity in *Sledd*, Lanigan has indeed *pleaded* that the Village had a policy of inadequate training or supervision.

Therefore, despite its paucity, in accordance with *Leatherman* and *Sledd*, it was error to dismiss the action against the Village (and against the defendants in their official capacities) solely on the pleadings. Lanigan and the Village should be allowed to develop a record suitable for summary judgment. Lanigan should be able to direct the district court's attention to the exact policy that he feels is unconstitutional and to explain how this policy amounts to deliberate indifference to citizens' rights. Then, if the district court determines that the policy is not, on its face, unconstitutional, Lanigan must offer more examples than just the single incident of his own. *Tuttle,* 471 U.S. at 823–24, 105 S.Ct. at 2436 (footnotes omitted) (quoted in *Donovan,* 17 F.3d at 954–55) ("[W]here the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation").

The allegations against the Village come close to the level of "boilerplate vagueness." *Sivard,* 17 F.3d at 188. However, we recognize that *Leatherman* does not require Lanigan to do more than he has done so far.[7]

### CONCLUSION

The district court's dismissals of Officer Wasek and Chief Robertson in their individual capacities are AFFIRMED. The district court's dismissals of Sergeant Krane and the Village of East Hazel Crest, as well as the dismissals of the individual defendants in

---

7. We need not address any possible qualified immunity defense, as such a defense is not available for a defendant municipality. *Leatherman,*

507 U.S. at 166, 113 S.Ct. at 1162 (citing *Owen v. City of Independence,* 445 U.S. 622, 650, 100 S.Ct. 1398, 1415, 63 L.Ed.2d 673 (1980)).

their official capacities, are REVERSED and REMANDED for further action in accordance with this opinion.