# United States Court of Appeals
## For the First Circuit

No. 02-1839

UNITED STATES OF AMERICA,

Appellant,

v.

ROSCOE B. SARGENT,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Lynch, Circuit Judge,
Coffin and Campbell, Senior Circuit Judges.

F. Mark Terison, Senior Litigation Counsel, with whom Paula D. Silsby, United States Attorney, was on brief, for appellant.

Brett D. Baber, with whom Baber & Weeks, P.A. was on brief, for appellee.

February 5, 2003

**LYNCH**, <u>Circuit Judge</u>. The question on appeal is whether the district court erred in suppressing evidence obtained in a search of an apartment, pursuant to a warrant. The suppression order was based on the brief amount of time -- five seconds -- between the police officers' knock and announcement and the forced entry into the apartment. Based on the circumstances showing a threat to the safety of the police officers, we hold the suppression order was in error and reverse.

I.

There is no material dispute as to the facts found by the trial court.

At about 7:30 p.m. on December 29, 2000, Special Agent Andrew Miller of the Maine Drug Enforcement Agency (MDEA) sought a search warrant for Roscoe Sargent's apartment in state court, based on information that Miller had received from a confidential informant (CI) only hours before. As his affidavit in support of the warrant stated, that very afternoon a reliable CI had made a purchase of drugs from Sargent at his apartment in Bangor. The controlled buy was recorded through a body microphone worn by the CI; Miller also surveilled the drug purchase from outside the apartment. During the buy, Sargent confirmed that he had a couple of pounds of marijuana and some psilocybin mushrooms for sale. Because of recent MDEA drug busts in the area, Sargent said that he wanted to "dump" (i.e. sell quickly) everything he had and get out

-2-

of the business until things cooled down.  Sargent asked the CI to help him sell the drugs quickly.  The CI said that Sargent retrieved the drugs from a large safe, four feet by three feet by three feet, which looked as though it was full of drugs.

Agent Miller did not request a no-knock warrant.[1]  The warrant was issued at 7:35 p.m. and, because it was a "daytime" warrant, had to be executed by 9:00 p.m.[2]

Miller asked the Bangor Police Department's Tactical Team to help him execute the warrant because he had safety concerns, and he briefed the team on those concerns.  He had reason to believe that a large number of knives was dispersed throughout Sargent's small, two-room apartment, and that there also might be firearms.  This information was not in the warrant, and we infer it came from the CI.  Miller later testified at the suppression hearing, "The intelligence that I had received was that anywhere that Mr. Sargent was in the apartment that he could put his hand on a knife."

---

[1] Miller testified that the reason he did not seek a no-knock warrant was the need for speed: he applied for a daytime warrant around 7:30 p.m., he had to go to the police department and get the Tactical Team ready to execute the warrant before 9:00 p.m., and he had one other warrant to execute that evening.

[2] One might inquire why Miller did not request a nighttime warrant for the search of Sargent's apartment.  Under Maine law, it is more difficult to obtain a nighttime warrant.  Further, there is an increased danger to police officers that accompanies nighttime raids.  Whatever the reason, he did not request a nighttime warrant, and so Maine law forbade its execution after 9:00 p.m.

That same evening, December 29, 2000, Miller and ten police officers from the Tactical Team executed the search warrant. The role of the Tactical Team, according to Bangor Police Officer Gregory Sproul, a member of the team, was "to make the entry, secure the premises and the people within the residence, and then turn it over to MDEA," which would search for illegal narcotics pursuant to the search warrant. At about 8:30 p.m., the group of ten police officers arrived at Sargent's apartment building, entered it, and proceeded down a hallway toward his unit.

Sproul testified at the hearing that upon reaching Sargent's apartment door, both he and another officer, John Heitmann, announced their presence by yelling words to the effect of "Bangor police, search warrant, open the door." At the same time, they knocked on the apartment door. The police officers then waited approximately five seconds. Sproul testified that he thought that five seconds was an appropriate amount of time to wait because he had "safety concerns," and because he had not heard anyone inside respond or make any motion to comply with their request to open the door. After the five second delay, Officer Sproul gestured to the "breaching man," Officer Al Hayden, who then smashed open the apartment door with a single stroke of a battering ram.

The apartment was too small for all of the officers to enter. Some of the officers entered the apartment and found

-4-

Sargent near the doorway; indeed, any place in the apartment was close to the door of the unit. A search of the apartment revealed, as expected, a cache of marijuana and psilocybin mushrooms. Officers also discovered, as expected, multiple knives and a firearm, a shotgun. There were knives throughout the apartment, in a variety of locations, including one stuck in the arm of the chair where Sargent had been sitting when the officers approached his door.

Sargent and his girlfriend, Heather Fliegelman, both testified that they had been sitting inside the small apartment's front room when they heard, in Sargent's words, "a lot of racket out in the hallway." Sargent rose out of his chair to investigate the noise. As he approached the apartment door, Sargent heard the police officers announcing their presence. Sargent testified that "I hollered that I was opening the door, and I got the door unlocked, but I didn't have a chance to even turn the doorknob because they smashed the door in without giving me a chance." Officer Sproul testified that he did not hear any declaration from Sargent that he was in the process of opening the door.

## II.

At the trial level, the courts addressing this issue were of different minds. The magistrate judge heard testimony on the defendant's suppression motion from Miller, Sproul, Sargent, and Fliegelman. In a thoughtful opinion, the magistrate judge

recommended denial of the motion to suppress, finding the officers' safety fears both genuine and legitimate and the speed of their actions reasonable in context. The magistrate judge analyzed the case as a de facto "no-knock" case. United States v. Sargent, No. 01-14-B-S, 2001 U.S. Dist. LEXIS 5977, at *5-*7 (D. Me. Apr. 30, 2001). The district judge agreed with the magistrate judge's recommendation and denied the motion on May 31, 2001.

In a subsequent opinion issued on July 12, 2001, the district judge, sua sponte, granted the motion to suppress, concluding that he was compelled to do so by the opinion of a panel of this court in United States v. Brown, 251 F.3d 286 (1st Cir. 2001). United States v. Sargent, 150 F. Supp. 2d 157 (D. Me. 2001). The panel opinion in Brown, though, was not the last word; rather, it was withdrawn, as is customary, when this court granted en banc review. United States v. Brown, 263 F.3d 1 (1st Cir. 2001). The en banc hearing in Brown ended in a tie vote, which reinstated the district court's denial of suppression in that case. United States v. Brown, 276 F.3d 14 (1st Cir. 2002).

Meanwhile, the government had appealed the grant of Sargent's motion to suppress. When the en banc result was reached in Brown, the government asked us to vacate the suppression order and remand this case to the district court to reconsider. We did so. United States v. Sargent, No. 01-2072 (1st Cir. Apr. 18, 2002). On remand, the district court reached a prompt decision and

maintained its second position granting the motion to suppress. United States v. Sargent, No. 01-CR-14-B-S (D. Me. May 28, 2002). It held this search was, de facto, a no-knock entry and that exigent circumstances did not justify the search. Id., slip op. at 4.

### III.

This court reviews de novo the ultimate conclusion as to whether a search was reasonable within the meaning of the Fourth Amendment. Ornelas v. United States, 517 U.S. 690, 700 (1996). Subsidiary factfinding by the district court is subject to review only for clear error. United States v. Meade, 110 F.3d 190, 193 (1st Cir. 1997). It is evident that the factual findings here are not clearly erroneous. There is no real dispute about the facts. The only dispute is whether the facts lead to the conclusion that the search was unreasonable.

Police acting under a warrant usually are required to announce their presence and purpose, including by knocking, before attempting forcible entry, unless circumstances exist which render such an announcement unreasonable. See Wilson v. Arkansas, 514 U.S. 927, 936 (1995). Wilson incorporated the common-law "knock and announce" rule into the Fourth Amendment reasonableness inquiry. Id. at 929. In Richards v. Wisconsin, 520 U.S. 385 (1997), a unanimous court held unconstitutional a blanket rule

which avoided the case-by-case reasonableness inquiry and suspended the knock and announce rule for felony drug cases. <u>Id.</u> at 392-94.

The common law knock and announce requirement recognizes the deep privacy and personal integrity interests people have in their homes.[3]  It also serves to protect the safety of police officers by preventing the occupant from taking defensive measures against a perceived unlawful intruder. <u>See</u> W.R. LaFave, <u>Search and Seizure</u> § 4.8(a), at 599 (3d ed. 1996).  The common law recognized, however, that the presumption in favor of announcement "would yield under circumstances presenting a threat of physical violence." <u>Wilson</u>, 514 U.S. at 936.

A very precise Fourth Amendment question is presented in this case.  There is no question about whether probable cause existed or whether the warrant was properly executed.  There is no question about delay in exercising the warrant, about whether it was executed late at night, or about whether the warrant was valid.

---

[3] These interests have long been protected.
> But before [the sheriff] breaks [the door], he ought to signify the cause of his coming, and to make request to open doors . . . , for the law without a default in the owner abhors the destruction or breaking of any house (which is for the habitation and safety of man) by which great damage and inconvenience might ensue to the party, when no default is in him; for perhaps he did not know of the process, of which, if he had notice, it is to be presumed that he would obey it . . . .

<u>Semayne's Case</u>, 77 Eng. Rep. 194, 195-96 (K.B. 1603) (<u>quoted in</u> <u>Wilson</u>, 514 U.S. at 931-32).

There is no question about whether the police knocked or whether their announcement was improper; the announcements were adequate to alert the inhabitants inside. The only question is whether the choice of the police officers to gain forcible entry after hearing no response within five seconds was unreasonable under the Fourth Amendment.

There have certainly been cases in which such short waits were held unreasonable. See, e.g., United States v. Granville, 222 F.3d 1214, 1218 (9th Cir. 2000) ("Under the facts of this case, five seconds cannot be considered 'a significant amount of time.'"); United States v. Lucht, 18 F.3d 541, 550-51 (8th Cir. 1994) (three to five seconds unreasonable); United States v. Marts, 986 F.2d 1216, 1217, 1220 (8th Cir. 1993) (less than five seconds unreasonable); West v. United States, 710 A.2d 866, 869 (D.C. 1998) (five seconds unreasonable); Commonwealth v. Means, 614 A.2d 220, 222-23 (Pa. 1992) (five to ten seconds unreasonable). These rulings are highly contextual, turning on factors that indicate whether the amount of time given was enough for the defendant to ascertain who was at the door and to respond, see Granville, 222 F.3d at 1218, and whether officers' safety was at risk, see Lucht, 18 F.3d at 551.

The general rule requiring announcement is itself simply part of the broader Fourth Amendment reasonableness inquiry. Wilson, 514 U.S. at 929. Wilson and Richards, which concern police

entries made without any announcement, are thus highly pertinent to the analysis here. The same interests identified in those cases are at issue in this one. "[T]he common law recognized that individuals should have an opportunity to themselves comply with the law and to avoid the destruction to property occasioned by a forcible entry. These interests are not inconsequential." Richards, 520 U.S. at 393 n.5 (citing Wilson, 514 U.S. at 930-32). Sargent's argument is that he was denied just such a reasonable opportunity to comply with the law and open the door to permit entry.

In order to justify entry without knocking on the basis of concern for officers' safety, the police must "have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous." Richards, 520 U.S. at 394. The Supreme Court in Richards imported the "reasonable suspicion" test from Terry v. Ohio, 392 U.S. 1 (1968), which requires that an officer "be able to point to specific and articulable facts," id. at 21, and have "at least a minimal level of objective justification," Illinois v. Wardlow, 528 U.S. 119, 123 (2000).

When circumstances lead officers to wait a shorter period of time between the knock and announcement and the forced entry, the no-knock "reasonable suspicion" analysis is appropriate as well. The officers, at the time of entry, must have articulable

-10-

facts concerning, for example, danger to themselves or destruction of evidence, which lead them to believe they can wait no longer.[4] This analysis applies the same reasonable suspicion standard to a short pause between announcement and entry as to a true unannounced entry; the government agrees that this standard is the appropriate one.  But there is a practical difference.  In the case of a brief but real pause, the officers know one additional fact: that their announcement has not been answered.  Combined with other factors, that can be enough to engender reasonable suspicion and permit forced entry.

The magistrate and district court judges analyzed this case as a de facto no-knock case.  In determining whether the police could enter unannounced, the judges considered only the evidence the police had at the time they approached Sargent's door. However, the presence of a reasonable suspicion of danger is properly analyzed at the time of entry.  At that moment, the officers knew what they knew earlier  -- that there were numerous readily available weapons and drugs in a very small apartment -- but they also knew for the first time that they heard no answer to their knocks and yells.  The five second delay, combined with the

---

[4] Even absent these types of circumstances, there is a limit to how long police must reasonably wait.  Entrance must be refused, see 18 U.S.C. § 3109 (2000); Wilson, 514 U.S. at 932, but silence may be construed as refusal, Granville, 222 F.3d at 1218.

factors we describe below, amounted to a reasonable suspicion of danger.

Despite the brevity of the period between announcement and entry there was, on these facts, no violation of the Fourth Amendment reasonableness standard. There are two key issues: whether it was reasonable for the police to expect a response within five seconds after the announcements, and whether it was reasonable for the police to fear a threat to their safety given the circumstances. The government agrees that both of these issues must be answered affirmatively for this search to be reasonable.

We conclude that it was objectively reasonable for the officers executing the warrant to think that:

1. Sargent was at his apartment, given that he was dealing drugs that afternoon from the apartment;

2. Sargent was awake and dressed at the time, between 8:30 and 9 p.m.;

3. Sargent had heard the two officers when they knocked, and each announced, given the small size of the apartment and the fact that the police were yelling;

4. Sargent may well have been alerted earlier when there was noise as eleven officers and a battering ram entered the small hallway outside his apartment (as he was in fact alerted);

-12-

5. Sargent thus had time to respond either verbally or by opening the door in the five seconds after the announcements and before the battering ram broke down the door, but he had not done either;

6. The police were at real risk because of the presence of knives, and possibly a gun, in the apartment, within easy reach for use anywhere in the apartment;

7. The very presence and location of so many knives was bizarre and Sargent's response to police entry could also be bizarre;

8. The knives and possible gun in the apartment were meant for use as weapons, given the significant quantities of drugs in the apartment and the apartment's use to stash drugs;

9. Sargent might try to avoid arrest, as he was aware of recent MDEA drug busts and told the CI he wanted to get away;

10. The risk to the officers increased with each second that Sargent did not respond after he had an opportunity to do so.

Objectively, the officers had reasonable suspicion that their safety would be threatened by further delay. The presence of all of these factors convinces us the search was constitutionally reasonable, despite the five second interval, in light of the threat to the safety of the officers.[5]

Absent that threat, the constitutional calculus in this case might be quite different. One purpose of the knock and

_____

[5] The government has not attempted to justify the short period on the ground that it was needed to prevent the destruction of evidence.

announce requirement is to permit occupants a reasonable period of time to permit the police to enter. We share the district court's assessment that serious Fourth Amendment concerns are validly raised when the response time between announcement and entry is so truncated.

There are no bright line rules about the amount of time officers must wait after they announce. Any "five second" or "ten second" categorical rule would be impermissible for the same reasons the categorical rule in Richards was impermissible. The rejection of per se rules works both ways. Just as no defendant should take comfort that a five second wait is per se unreasonable, no police department should take comfort that a ten or twenty second wait is reasonable or generally acceptable. The reasonableness inquiry requires that each case be analyzed on its own facts. United States v. Spikes, 158 F.3d 913, 926 (6th Cir. 1998) ("The Fourth Amendment's 'knock and announce' principle, given its fact-sensitive nature, cannot be distilled into a constitutional stop-watch where a fraction of a second assumes controlling significance.").

This court's precedents support the reasonableness, in context, of this search. This court has upheld an entry at a side door five to ten seconds after officers knocked and where other officers at the front door had previously started knocking, and where there were justifiable fears that the occupants would flush

drugs down the toilet. United States v. One Parcel of Real Prop., Etc., 873 F.2d 7, 9 (1st Cir. 1989). The court held it was reasonable for the officers to conclude an additional wait would be fruitless. Id. at 9-10. In United States v. Garcia, 983 F.2d 1160 (1st Cir. 1993), this court upheld as reasonable a wait of ten seconds after knocking when the contraband could be disposed of easily. Id. at 1168; see United States v. DeLutis, 722 F.2d 902, 908-09 (1st Cir. 1983) (twenty second wait not unreasonable); see also United States v. Lipford, 203 F.3d 259, 270 (4th Cir. 2000) (five second wait reasonable where occupant had opened the door more quickly just before and where there was a risk of destruction of evidence); United States v. Markling, 7 F.3d 1309, 1318 (7th Cir. 1993) (seven second wait sufficient before entry into small motel room).

We emphasize that there is no requirement that officers serving a search warrant have evidence of the defendant's prior use of violence or even of his particularized propensity for violence in order for exigent circumstances to exist. Such evidence will, of course, make it easier to establish a reasonable suspicion of a threat. But the absence of such evidence does not establish there is no reasonable suspicion of a threat. Nonetheless, the district court discounted the threat to the officers here, saying:

> [T]he evidence the police possessed at the time they
> entered Defendant's residence was insufficient to support
> a reasonable suspicion of danger. The officers were
> aware only that Defendant possessed a number of knives

-15-

that were easily accessible, and that Defendant distributed drugs from his residence. Those two facts do not support a reasonable inference that the police, by knocking and announcing their presence, would place themselves in harm's way. Many people own all manner of knives for general purposes, and in a small apartment such as Defendant's it would not be unusual for the occupant to be able to reach a knife quickly. Although it is true that the police suspected that Defendant distributed drugs from his residence, there is no evidence on the record tending to draw a connection between Defendant's ownership of knives and the drug sales.

These conclusions are error for a variety of reasons. It is not common for people to keep so many knives in so many places in their homes that a knife is always within easy reach. To the contrary, such behavior is bizarre. These knives were weapons. The fact that the police knew the knives were there most likely meant that the CI had seen them openly displayed throughout the apartment. Since Sargent was an active drug dealer with a substantial stock of drugs and weapons at hand, there was adequate reason to think the knives were intended to convey a message that Sargent would protect himself and his drugs. The message sent by the presence of the knives was reinforced by the suspected presence of a gun, later verified.

The knives and the possible firearm posed a real danger to the police on any objective analysis. If Sargent chose to fight, the police were at risk of injury or death. They had reason to fear a knife fight in close quarters, with Sargent having the advantage: he knew both the layout of the place and the location

of the knives; the officers did not. Even though their numbers gave them an advantage, this did not foreclose the real possibility of serious injury to one or more officers.

Finally, the fact that there was no response from Sargent -- either verbal or physical by opening the door -- for five seconds after the announcement by two officers has significance. It was entirely reasonable for the officers to become increasingly nervous. The small size of the apartment meant that the five seconds after knocking with no response was even more ominous. The officers' fears were genuine, and there was a genuine basis for them. By adopting its view that this was de facto a no-knock case and should be analyzed as such, the district court was led to overlook this last important factor -- the lack of response from Sargent.

The allowance of the motion to suppress is **reversed**, the motion should be denied and the case is **remanded** for further proceedings.