**Andrew SLEDD, Plaintiff–Appellant,**

v.

**Guy LINSDAY, et al., Defendants–Appellees.**

**No. 95–2360.**

United States Court of Appeals, Seventh Circuit.

Argued April 15, 1996.

Decided Dec. 11, 1996.

G. Flint Taylor (argued), Jeffrey H. Haas, Erica Thompson, People's Law Office, Chicago, IL, for Plaintiff–Appellant.

Lawrence Rosenthal, Timothy Joranko (argued), Benna R. Solomon, Susan S. Sher, Office of the Corporation Counsel, Appeals Division, Chicago, IL, for Defendants–Appellees.

Before COFFEY, RIPPLE, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Late in the evening of March 31, 1989, several Chicago police officers used a battering ram to break into the home of Andrew Sledd, in the course of executing a search warrant they had obtained the day before.

In the ensuing melee, one of the officers shot Sledd. Two years later (on March 29, 1991), Sledd brought this action under 42 U.S.C. § 1983 against the officers and the City of Chicago, claiming that the police defendants had used excessive and unjustifiable force against him, falsely arrested and imprisoned him, and maliciously prosecuted him, and that they had acted pursuant to unconstitutional policies and customs of the City of Chicago. The district court granted the motion for summary judgment filed by the individual defendants on the basis of qualified immunity from suit, dismissed the action against the City under Rule 12(b)(6), and dismissed the remainder of Sledd's claims with prejudice. We conclude that the district court should not have dismissed the claims against the City at such an early stage and that it overlooked genuine issues of material fact that require a trial on Sledd's claims against the officers.

## I

Andrew Sledd was, at the time of the incident, 23 years old, a 5 feet 9 inches African–American man with a light complexion. He lived in a townhouse at 1408 E. 55th Street in Chicago, along with his parents, Yvonne and Jesse Greene, and his younger brother, Jesse Jr., who was then six years old. He was attending St. Xavier College on a basketball scholarship. Officers Guy Lindsay, Elroy Baker, Ernest Brown, and Herman Cross, all of the Chicago Police Department (CPD), were the individual defendants. What happened on the evening of March 31, 1989, is the subject of dispute between the parties, but even more importantly, they dispute which facts are even properly before this court on our review of the district court's decision to grant summary judgment. Before turning to the relevant background facts, we therefore begin with the proceedings that led up to the decision on summary judgment.

As required by Northern District of Illinois Local Rule 12(M), the individual defendants filed their "Local Rule 12(m) Statement of Undisputed Facts," which set forth their account of the evening's events with pertinent citations to the record. Sledd responded by filing both his "Plaintiff's Answer to Defendants' 12(m)," as required by Rule 12(N)(3)(a), and his "Plaintiff's Rule 12(n) Statement of Facts," as required by Rule 12(N)(3)(b). As permitted by the final paragraph of Rule 12(M), the defendants then filed their Rule 12(M) Reply, which they later presented as a Consolidated Rule 12(M) statement. The district court acknowledged that all these materials were before it, but it found Sledd's Rule 12(N)(3)(a) denials defective in that "the referenced materials do not support the denials and disagreements." *Sledd v. Lindsay,* 864 F.Supp. 819, 826 (N.D.Ill.1994). It criticized Sledd for "inundating the court with superfluous and extraneous facts and references to immaterial records." Consequently, the court decided to "accept[ ] defendant officers' 12(M) statement of facts, which Sledd either admits or insufficiently denies, as admitted, and consider only those facts that are both material and properly alleged in Sledd's 12(N)(3)(b) statement as additional facts requiring a denial of the motion."

In his opening brief in this court, Sledd did not specifically discuss the way in which the district court handled the Rule 12(M) and (N) filings; instead, he argued directly that there are disputed issues of material fact that require reversal of the summary judgment in favor of the individual defendants. The City responded with the argument that a district court's decisions with respect to Local Rule 12 are entitled to considerable deference by this court, and that Sledd, by failing to address this point in his initial brief, was required to argue the case solely on the basis of the facts accepted by the district court. Sledd replied that the district court neither struck his Rule 12 submissions nor did it adopt the City's version wholesale; to the contrary, it plainly considered at least some of his evidence but found it unpersuasive. Thus, he asserts, he forfeited nothing by arguing in his opening brief that the materials filed in opposition to the defendants' motion raised genuine issues of fact, without mentioning the Rule 12 exchanges in particular.

■ The City is correct that this court has frequently noted that we give the dis-

trict judge's interpretation of the local rules considerable weight. See, *e.g., Midwest Imports, Ltd. v. Coval,* 71 F.3d 1311, 1316 (7th Cir.1995); *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 923 n. 4 (7th Cir.1994); *Bell, Boyd & Lloyd v. Tapy,* 896 F.2d 1101, 1103 (7th Cir.1990). Local Rule 12 and its counterparts elsewhere are of considerable help to busy district judges who must determine which cases present genuine issues requiring a trial and which do not. Furthermore, the City is correct to note that arguments for reversal cannot be withheld until a reply brief, because the appellee then has no chance to respond to them. See, *e.g., Arch of Illinois v. District 12, UMW of America,* 85 F.3d 1289, 1294 (7th Cir.1996); *Maher v. Harris Trust & Sav. Bank,* 75 F.3d 1182, 1191 (7th Cir.1996); *Wilson v. O'Leary,* 895 F.2d 378, 384 (7th Cir.1990), citing 7th Cir.R. 28(f). Nevertheless, we agree here with Sledd that the application of those clear principles to his case does not require us to disregard the materials he submitted. The district judge's comment was simply that he did not find most of the materials referenced in Sledd's Rule 12(N) submissions to be responsive to the City's filing on behalf of the police officers. This was just another way of saying that he thought Sledd's submissions had not succeeded in raising a genuine issue of fact; as Sledd noted, the judge did not reject the Rule 12(N) filing for procedural insufficiency. The fact that the judge took into consideration those parts of the Rule 12(N) filing that he found to be useful indicates that he was simply evaluating the response on the merits.

This case is therefore distinguishable from the many cases cited by the City in which parties simply did not file responses or statements in the form required by the local rule. See *Flaherty v. Gas Research Inst.,* 31 F.3d 451, 453 (7th Cir.1994) (statement included no pertinent affidavits or portions of transcript); *Waldridge,* 24 F.3d at 923–24 (statement failed to identify factual issues or cite to record); *Maksym v. Loesch,* 937 F.2d 1237, 1240–41 (7th Cir.1991); *Appley v. West,* 929 F.2d 1176, 1179–80 (7th Cir.1991) (per curiam) (no statement); *Bell, Boyd,* 896 F.2d at 1102–03 (statement included no references

to supporting materials). Sledd was entitled to argue in his opening brief that the materials in the record showed that summary judgment was wrong; the City in turn had every right to respond that the record included less than Sledd thought it did, but this is a defensive point, not an opening gambit. We note that it is unclear in any event which parts of the Rule 12(N) statements the district court chose to credit and which it disregarded. No matter; on this review from the summary judgment for defendants, we both can and must make an independent review of the record, as reflected in the Rule 12(M) and 12(N) filings, to see if the decision was correct. See *Wolf v. Buss (America) Inc.,* 77 F.3d 914, 922 (7th Cir.), *cert. denied,* 519 U.S. ——, 117 S.Ct. 175, 136 L.Ed.2d 116 (1996); *Midwest Imports,* 71 F.3d at 1313; *Highlands Ins. Co. v. Lewis Rail Serv. Co.,* 10 F.3d 1247, 1249 (7th Cir.1993).

As we did in *Bell, Boyd,* we have reviewed Sledd's responses under Rule 12(N)(3)(a) and (b) independently, to see if he indeed made appropriate references to the record in his responses to the Rule 12(M) statement. In our view, he did. The key factual disputes that he wished to raise are apparent when one looks at all the materials taken together. Our review here therefore proceeds on the usual ground for an appeal from summary judgment: we review the district court's decision *de novo,* taking the facts in the light most favorable to the non-moving party.

## II

From that point of view, the events of March 31, 1989, unfolded as follows. The day before, Officer Brown had obtained a search warrant for the premises at 1408 E. 55th Street and a male African–American known as Jessie Greene, approximately 22 years old, six feet tall, of a slender build and dark complexion. The house at that address had either light curtains or open windows, through which persons on the street could observe activity within the house. The parties dispute whether 55th Street was busy or quiet on the night in question, but according to Sledd, "on March 31, 1989, prior to the incident, the street was empty and quiet." (The police officers asserted (not quite re-

sponsively) that it was "a well-trafficked street which might muffle the sound of voices.")

Around 10:30 p.m., seven members of the CPD, including the four defendants here, began their execution of the search warrant. It is undisputed that none of the officers was in full uniform. Furthermore, according to Sledd, none was wearing any visible insignia that would have led a person to believe that they were police officers and not intruders. (The officers assert that they were wearing Department-issued bulletproof vests with police patches on the breast plate, but it is possible they may have had coats over the vests for the late March evening weather. They claim they were wearing baseball caps with CPD insignia, but this point is disputed also.) When they arrived at the house, they began bashing the door, eventually breaking it down. Sledd heard no announcements that they were police officers, nor did he hear any attempted knocking. The neighbors in the adjacent duplexes also heard no "knock and announce" prior to the officers' forced entry into the house. Finally, the Greenes' babysitter, who was on the first floor of the house, testified that she believed that the men were intruders and did not realize they were police officers until after Sledd was shot. Whether or not the police made such efforts is a disputed fact, because the officers claimed that they had knocked and announced that they were police officers before they broke in. Sledd asserted that he would have heard any such announcement, as would the neighbors, because as noted above the street was quiet that night. He also testified that the television set in the house was on a low volume, and that he normally could hear people conversing by the bus stop 10–15 feet away from his front door.

At the time the police started to enter the house, Sledd was upstairs about to take a shower. He heard the banging on the door and started to go downstairs, wearing only a towel. By the time he was halfway down the stairs, the police broke through the door. Fearing that they were intruders up to no good, Sledd raced back up the stairs and went into his bedroom to retrieve his .22 caliber Marlin sport rifle. His fiancee, Maria

Delos Reyes, asked him what was happening, and he responded that someone was breaking in. When he turned back to the doorway of the room, he saw an African–American man standing there with a gun; the man was wearing blue jeans, a blue jacket, and white tennis shoes. After a split second, the man turned and ran, saying "he's got a gun, let's get the fuck out of here." Sledd followed, hoping to run him out the broken front door. As soon as Sledd turned into the stairwell, still holding the rifle, he got a glimpse of the man on the stairs looking back over his shoulder with his gun pointed at Sledd. Sledd's rifle was not pointed at the man (at that time or at any other time); instead, he held it across his chest with the barrel pointing up toward the ceiling. A "storm of gunfire" broke out from the unidentified man, Sledd was shot immediately, and he collapsed on the floor. At no time during his brief encounter with the man did anyone shout out "police," "freeze, police." The man, who turned out to be Officer Baker, then rolled Sledd over, put the gun to his head, and said "We're the police, you asshole. I should blow your fucking brains out." Sledd asked him to call an ambulance, but in response Baker struck him on the head and kicked him in the groin.

After Sledd was shot, the police searched the house. They found six clear plastic bags containing cocaine, and they arrested Sledd and took him to the hospital. He was charged under Illinois law with attempted murder (based on the police officers' allegation, disputed by Sledd, that the rifle he was holding was pointed threateningly at them), armed violence, aggravated assault, and possession of cocaine and cannabis. After a bench trial in the Circuit Court of Cook County, Sledd was found not guilty on all charges. Officer Lindsay, on the other hand, who led the raid on Sledd's house, was a cocaine user, whose habit was reported to the CPD in December of 1989. He was suspended from the CPD in January 1990 for cocaine use, after drug tests proved to be positive, and was eventually fired from the CPD in January 1991. Officer Smith, according to Sledd, had the opportunity to plant the cocaine that was found in his coat pocket on the night in question.

Sledd's first amended complaint, as noted above, also raised in Count VII the claims that the City of Chicago Police Department failed "to properly supervise, discipline, transfer, counsel and otherwise control" officers and that the Department maintains a *de facto* code of police silence under which officers will not report or testify against other officers who commit unconstitutional acts. The complaint included statistics about the number of excessive force complaints that have been filed annually against the CPD over the last fifteen years (from 2,000 to 2,500 annually), the number of investigations by the Department's Office of Professional Standards (5 percent of the annual total, with about 1.5 percent of the total being sustained), and an OPS estimate, based on an internal audit, of the number of complaints that have merit (about 20 percent). It alleged in considerable detail how the "code of silence" operated, and it claimed specifically that the code injured Sledd because the officers responsible for using excessive force and otherwise abusing him had good reason to believe that their misconduct would not be revealed by their fellow officers and that they would effectively be immune even if a complaint was filed. The district court, however, in an order dated December 4, 1991, found that Count VII failed to state a claim on which relief could be granted and accordingly dismissed it.

## III

### A. The Individual Defendants

The first question we consider is whether the district court correctly determined that the police officers were entitled to qualified immunity for their actions on the night of March 31, in the light of the record assembled for summary judgment. Qualified immunity shields the officers from suit "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). As we stated in *Erwin v. Daley*, 92 F.3d 521, 525 (7th Cir.1996), "[t]he inquiry focuses on the objective legal reasonableness of the action, not the state of mind or good faith of the officials in question." See *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987). When a defendant officer raises the defense of qualified immunity, the plaintiff bears the burden of showing that the officer violated a clearly established constitutional right. *Clash v. Beatty*, 77 F.3d 1045, 1047 (7th Cir.1996). One way of doing so, in an excessive force case like this one, is to show that the force was so excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment. *Id.* at 1048.

Even before the Supreme Court held in *Wilson v. Arkansas*, 514 U.S. ——, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995), that the common law "knock and announce" principle forms part of the reasonableness inquiry under the Fourth Amendment, the Illinois Supreme Court had already taken essentially the same approach, in *People v. Saechao*, 129 Ill.2d 522, 136 Ill.Dec. 59, 544 N.E.2d 745 (1989); *People v. Ouellette*, 78 Ill.2d 511, 36 Ill.Dec. 666, 401 N.E.2d 507 (1979); and *People v. Wolgemuth*, 69 Ill.2d 154, 13 Ill.Dec. 40, 370 N.E.2d 1067 (1977), *cert. denied*, 436 U.S. 908, 98 S.Ct. 2243, 56 L.Ed.2d 408 (1978). Both the Supreme Court and the Illinois Supreme Court recognized that exceptions to "knock and announce" might exist, as when exigent circumstances require immediate action, or where knocking alone (without any announcement) for a long enough time may alert residents to the police officers' presence. See *Saechao*, 136 Ill.Dec. at 63, 544 N.E.2d at 749. Nevertheless, normally police must knock and announce their presence, to avoid the very kind of misunderstanding that arose in Sledd's situation.

In a case with facts quite similar to ours, the Sixth Circuit found that a police officer was not entitled to qualified immunity from suit where the officer had entered a dark hallway at 2:45 a.m. without identifying himself as a police officer, without shining a flashlight, and without wearing his hat. See *Yates v. City of Cleveland*, 941 F.2d 444, 447 (6th Cir.1991). It was, the court concluded, objectively unreasonable for the officer to enter the area in that manner, and thus he was not entitled to qualified immunity from

suit. The court drew this conclusion notwithstanding the officer's argument that, at the time he shot the plaintiff, he reasonably believed that his life was in danger. The act of entering a private residence late at night with no indication of identity was enough to show that the officer had unreasonably created the encounter that led to the use of force. We too have held that in a situation where a person has no reason to know that someone is a police officer, and the officer's identity is concealed, the normal rules governing use of deadly force and right to resist are modified. See *Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir.1993); compare *Soller v. Moore*, 84 F.3d 964, 970 (7th Cir.1996) (no need for instruction on negligent identification and self-defense where officer repeatedly identified himself as a police officer to both parties).

■ Here, there are jury issues on several crucial questions. First, the parties dispute whether the officers announced their presence and warned Sledd that they were police executing a warrant. The police officers have not claimed any exigent circumstances to exempt their actions from the usual "knock and announce" rule. Sledd introduced testimony from a number of persons that no warnings were given and that the officers were not otherwise identifiable as members of the police department. Second, the parties dispute whether a reasonable police officer would have thought Sledd posed such a risk under all the circumstances that the immediate use of deadly force was justified. Viewed in the light most favorable to Sledd, the evidence shows that Baker's act of shooting Sledd at the top of the stairs was unjustified, even assuming that the police still had some right of self defense after they had broken into the house and failed to identify themselves or to announce their purpose. In short, Sledd's evidence shows that the police officers behaved in an objectively unreasonable fashion and were therefore not entitled to qualified immunity. Given the significance of the disputed issues of fact here, qualified immunity from *suit* is effectively unavailable, even though after a full trial the officers may yet prevail on the merits.

■ Sledd's claims for false arrest and false imprisonment should also be reconsidered on remand. If the police had not impermissibly created the situation in which he felt the need to arm himself and resist people he believed to be intruders, neither the arrest nor the imprisonment would have taken place. The search that produced the drugs was the direct result of the initial challenged entry, which means that both must be reconsidered on remand. Although Sledd introduced circumstantial evidence tending to show that the drugs had been planted by the police in order to support a false arrest, we express no view on his alternative theory for contesting the false arrest, beyond our holding that the defendant officers are not entitled to qualified immunity. Finally, Sledd relegated his state malicious prosecution claim arguments to a footnote in his opening and reply briefs, with no citations to relevant Illinois law. This is not sufficient, under our rules, to preserve this point for review, and we therefore consider it forfeited. See *Sokaogon Gaming Enterprise Corp. v. Tushie-Montgomery Assocs.*, 86 F.3d 656, 658 (7th Cir.1996); *Tyler v. Runyon*, 70 F.3d 458, 464 (7th Cir.1995); *Pelfresne v. Village of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir. 1990), *cert. denied*, 506 U.S. 985, 113 S.Ct. 493, 121 L.Ed.2d 431 (1992); *United States v. White*, 879 F.2d 1509, 1513 (7th Cir.1989), *cert. denied*, 494 U.S. 1027, 110 S.Ct. 1471, 108 L.Ed.2d 609 (1990).

### B. The City of Chicago

■ As noted above, the district court dismissed Count VII, which claimed that the City of Chicago Police Department maintained official policies and customs that violated Sledd's rights, for failure to state a claim on which relief can be granted. See generally *Monell v. Department of Soc. Servs. of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Donald v. Cook County Sheriff's Dept.*, 95 F.3d 548 (7th Cir. 1996); *Harris v. City of Marion, Ind.*, 79 F.3d 56 (7th Cir.1996). With respect, we believe that the district court jumped the gun, given the detailed allegations Sledd included. Plaintiffs in a § 1983 case against a municipality are required to comply only with the conventional standards of notice pleading; they are not required to meet any heightened pleading standard. See *Leatherman v. Tarrant County Narcotics Intelli-*

*gence and Coordination Unit,* 507 U.S. 163, 165, 113 S.Ct. 1160, 1161–62, 122 L.Ed.2d 517 (1993). The court stated that Sledd had "failed to identify specific factual patterns in the [OPS] complaints that are relevant to the alleged deprivation of his rights." Sledd did, however, specifically allege that the City and the CPD maintained a code of silence; that disciplinary complaints almost never resulted in official censure; and that this practice hurt him in particular, by making the officers believe their actions would never be scrutinized. Recalling that on a Rule 12(b)(6) motion the plaintiff must be allowed to go forward with the case if relief could be granted under any set of facts that the plaintiff could prove consistent with the allegations in the complaint, see *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Jones v. General Elec. Co.,* 87 F.3d 209, 211 (7th Cir.1996), we conclude that it was error to dismiss this part of the case solely on the pleadings. Once the parties have been able to develop a record suitable for summary judgment motions, the district court will be in a far better position to see if Sledd can back up his allegations with anything that entitles him to a trial. See *Auriemma v. Rice,* 957 F.2d 397 (7th Cir.1992).

For the reasons stated, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.