In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 04-2993

MICHAEL J. GREEN and
CHERYL POULSEN,

*Plaintiffs-Appellants*,

*v.*

MARLO BUTLER, DAVID CARROLL,
MARK SALSBERRY, et al.,

*Defendants-Appellees*.

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 3120—**Charles P. Kocoras**, *Chief Judge.*

———————

ARGUED MAY 4, 2005—DECIDED AUGUST 24, 2005

———————

Before RIPPLE, ROVNER and WOOD, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Michael Green and Cheryl Poulsen rented a room in their residence to a state parolee, Michael Belter. The named Illinois parole agents ("the agents" or "the State") entered the residence to search Belter, prompting Mr. Green and Ms. Poulsen to file this § 1983 action for violations of their rights under the Fourth Amendment. The district court granted summary judgment to the agents, holding that Mr. Green and Ms.

Poulsen failed to demonstrate a Fourth Amendment violation and, in the alternative, that the officers enjoyed qualified immunity. Mr. Green and Ms. Poulsen appeal the grant of summary judgment. For the reasons set forth in the following opinion, we reverse the judgment of the district court and remand for further proceedings.

**I**

**BACKGROUND**

**A. Facts**

In February 2003, Mr. Green owned a home in Warrenville, Illinois, where he resided with his girlfriend, Ms. Poulsen. Mr. Green also rented a room in the house to Belter, "[a] long-time acquaintance" of Mr. Green's. R.29 at 1. Belter had been convicted in state court of criminal sexual assault against a minor. At the time of the search, he was on parole and electronically monitored.

As a condition of his parole, Belter executed a "Host Site Agreement" when he moved into the residence. He identified himself as the host and did not indicate that anyone else lived at the residence.[1] As relevant here, the agreement

---

[1] It is apparent that the Host Site Agreement's purpose was to ensure that the homeowner—Mr. Green—knew that the parolee was subject to search at any time and consented to such search. The form's introductory provision stated: "I, ___[Host's Name]___, voluntarily agree to allow ___[Offender's Name]___, to reside at my residence . . . ." R.26, Ex.16. The "I" in the consent provision thus referred to the host, not the offender.

Belter listed his own name in both the "Host's Name" and "Offender's Name" spaces, placed his own initials next to

(continued...)

provided: "I [the undersigned] understand that my resi-
dence is subject to search at any time by parole agents or
designated Illinois Department of Corrections' [sic] staff and
I explicitly consent thereto." R.26, Ex.16. Mr. Green knew
that Belter was on parole, but neither he nor Ms. Poulsen
knew about the Host Site Agreement or its conditions. There
is some evidence that Belter's parole agent, Richard Guise,
knew that Belter lived with Mr. Green; according to Belter,
Guise told him to execute the agreement in the way that he
did because it was merely a "technicality." R.28 at 12. When
Guise retired, Belter's file was transferred first to parole
agent Jeffrey Bryant. Bryant apparently knew that Belter
lived with Mr. Green because at one point Belter asked
Bryant to stop calling him at the residence telephone
number because the calls had caused problems with his
host. After a short period, Belter's file again was transferred
to parole agent Marlo Butler, who repeatedly received
computer status updates indicating that Belter lived alone.

On February 23, 2003, Butler and Bryant made a routine
visit to Belter's residence. Belter answered the door, quickly
stepped outside and shut the door behind him. The agents
asked to enter the residence, but Belter refused to let them.
Belter informed the agents that he was renting a room, that
the owner, Mr. Green, was not at home but would return
soon and that Mr. Green would not want them to come
inside. The agents asked Belter to inform Mr. Green that
they would return later that afternoon and left without
entering the residence.

Butler then called fellow parole agent Mark Salsberry.

---

[1] (...continued)
each condition and signed over the space labeled "Host's
Signature."

Later that day, Salsberry, together with agents David Carroll and Amy Freund, were briefed by Butler and Bryant at a nearby restaurant parking lot. They met for up to fifteen minutes, during which time the agents checked the department computer files, which still indicated that Belter lived alone. The agents agreed that they should return to the residence, determine why Belter had refused them entry and explain the parole conditions to him. Bryant's entry in the computer system confirmed that purpose: "AGTS CAME BY A SECOND TIME TO GO OVER WITH HOST H/S [Host Site] AGREEMENT AND PROGRAM RULES." R.28 at 22. There is no indication that the agents believed that they, or anyone else in the home, were in danger or that the home contained evidence of a crime.

Meanwhile, Mr. Green and Ms. Poulsen had returned to the residence. Belter told his host of the parole agents' visit and informed him that they would return. Mr. Green went out to the garage while Ms. Poulsen and Belter remained in the house. When the agents returned, the garage door was open, and they saw Mr. Green. Carroll and Butler entered the garage. According to Mr. Green, "David Carroll said 'Where is Mike Belter?' as he was going through the garage, and I said 'He's in the house.' He brushed me aside with his arm and stated 'This is what you get for not cooperating.'" R.26, Ex.2 at 51. The two agents exited the garage through a side door and, together with Salsberry and Freund (Bryant remained near the street), opened and entered through the unlocked front door of the residence, with Mr. Green following. The parties dispute whether the agents first knocked and announced their presence before entering, and it is not clear whether Belter saw them approach or whether the agents or a house occupant opened

the door.[2] According to Ms. Poulsen, the first agent to enter

---

[2] It appears that the "door" to Mr. Green's home is actually two doors—a glass storm door and a wooden interior door. It is not clear if either door was open, nor is it clear where Belter was located, who let the agents into the residence, or whether the agents knocked before entering.

Belter indicated in his deposition that he was in the basement with some friends when the door (presumably the basement door, after the agents had entered) flew open and Carroll called his name. R.26, Ex.9 at 66.

According to Ms. Poulsen, both doors were closed and the agents neither knocked nor announced their presence before entering. A "very big heavyset gentleman"—it is not clear from her testimony whether she referred to Carroll or Salsberry—entered first but never knocked. R.26, Ex.3 at 18-19.

Salsberry testified that he noticed people inside the house, asked if one was Belter and, upon receiving an affirmative response, opened the door and entered the house. It is not clear from his testimony whether the storm door was closed and the interior door was open, or whether both doors were closed. He did not knock, ring the doorbell or say anything else "because [he] could see the people standing right there." R.26, Ex.6 at 50.

Butler testified that Belter was "standing at the screen door" when Salsberry spoke to him, and said nothing about a knock or entry. R.26, Ex.4 at 62.

Freund testified that the storm door was closed, the interior door was open and Belter was standing at the door. She recalled Salsberry asking "Are you Mike Belter?" and then opening the storm door and entering the residence. R.26, Ex.7 at 34-40.

Carroll alone testified that Salsberry knocked and that someone—he was not sure who but indicated that it was not

(continued...)

told her to keep her dog away or he would shoot it.[3] The agents then handcuffed Belter.

Mr. Green followed the agents into the house. He testified that he did not know who they were, and that he asked repeatedly "Who are you people?" R.26, Ex.2 at 62. Eventually, according to Mr. Green, Carroll responded: "Here's my badge, here's my ID and here's my gun. Get out of my way." R.26, Ex.2 at 63. Salsberry took Belter to his bedroom while Mr. Green and Carroll argued about whether the former had signed a host site agreement. The other agents looked around the rest of the residence. Accounts vary as to how long the incident lasted, from thirteen minutes to an hour, but at the conclusion Belter was released, Mr. Green signed a host site agreement and Butler apologized for the incident.

## B.  District Court Proceedings

Mr. Green and Ms. Poulsen brought this § 1983 action against the parole agents for violating their rights under the Fourth Amendment to the Constitution of the United States, because the agents entered without a warrant and unreasonably failed to comply with the "knock and announce" rule. The agents moved for summary judgment.

The district court granted the agents' motion and entered judgment in their favor. In doing so, the court rejected the

---

[2]  (...continued)
one of the agents—opened the door and let them in. R.26, Ex.5 at 58-59.

[3]  According to some of the officers' depositions, they knew or suspected that a dog was present in the home.

plaintiffs' argument on the merits. It determined that, even if the agents had failed to knock and announce their presence before entering, the knock and announce rule is but one factor to consider in assessing whether an entry and search is unreasonable under the Fourth Amendment. Accordingly, the district court analyzed the totality of circumstances, balancing the degree of privacy invasion with the State of Illinois' promotion of its legitimate interests. The court found the invasion of privacy to be minimal. It noted that Mr. Green and Ms. Poulsen had a decreased expectation of privacy because they knew that their housemate Belter was a parolee, a fact reducing both their subjective expectations of privacy and the objective expectations of society. Moreover, the court looked to the level of intrusiveness inherent in the search itself. It determined that the parole agents confined themselves to searching common areas of the home and that there was no evidence that the search was a veiled attempt to circumvent warrant requirements. On the other hand, the district court found Illinois' interest to be compelling. The district court found a particular interest in maintaining public safety because parole exposes a known offender to the public before he has served fully his sentence and because recidivism rates are high. Illinois' interests were at their height, according to the district court, as a reaction to Belter's suspicious behavior when the agents arrived the first time. On balance, then, the district court found that the search comported with the Fourth Amendment despite the agents' failure to knock and announce.

In the alternative, the district court held that the agents enjoyed qualified immunity from suit. Even assuming that Mr. Green and Ms. Poulsen established a Fourth Amendment violation, the district court found that they could

not satisfy the second prong of the qualified immunity analysis because "the unusual factual circumstances of this case make the contours of Green and Poulsen's rights in this situation fuzzy enough that it would not be clear to a reasonable agent in the same setting that the course of conduct the agents undertook was unlawful." R.29 at 10-11.

## II

## DISCUSSION

### A.  Standard of Review and Legal Standards

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We review the district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving parties, Mr. Green and Ms. Poulsen. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chortek v. City of Milwaukee*, 356 F.3d 740, 745 (7th Cir. 2004).

The Constitution of the United States guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. The touchstone of Fourth Amendment inquiry is reasonableness,[4] a standard measured in light of the

---

[4] It is undisputed that the agents entered Mr. Green's home without a warrant supported by probable cause. "It is a basic

(continued...)

totality of the circumstances and determined by balancing the degree to which a challenged action intrudes on an individual's privacy and the degree to which the action promotes a legitimate government interest. *United States v. Knights*, 534 U.S. 112, 118-19 (2001); *see also Ohio v. Robinette*, 519 U.S. 33, 39 (1996). The reasonableness requirement, and the totality of the circumstances inquiry, extends to the manner in which a search is conducted. *United States v. Banks*, 540 U.S. 31, 35 (2003).

In interpreting the Fourth Amendment, the Supreme Court has "looked to the traditional protections against unreasonable searches and seizures afforded by the common law at the time of the [Constitution's] framing." *Wilson v. Arkansas*, 514 U.S. 927, 931 (1995). One such "traditional protection" is the requirement that "officers entering a

---

[4] (...continued)

principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal quotation marks omitted). In *Kyllo v. United States*, 533 U.S. 27, 31 (2001), the Supreme Court reiterated this principle, noting that "[w]ith few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." It is clear, however, that a parolee does not have a sufficient expectation of privacy to justify the warrant requirement. *See United States v. Knights*, 534 U.S. 112, 120-21 (2001); *Griffin v. Wisconsin*, 483 U.S. 868, 873-74 (1987). Mr. Green and Ms. Poulsen make no argument before us that the absence of a warrant in this case violated their Fourth Amendment rights. Instead, they argue that the nonobservance of the knock and announce requirement rendered unconstitutional the entry of the officers. We shall limit our own inquiry to the argument made before us.

dwelling must knock on the door and announce their identity and purpose before attempting forcible entry." *Richards v. Wisconsin*, 520 U.S. 385, 387 (1997).

This common law "knock and announce" principle forms "an element of the reasonableness inquiry under the Fourth Amendment." *Wilson*, 514 U.S. at 934; *see generally id.* at 931-36 (surveying the common law principle). In *Wilson*, the Supreme Court noted three circumstances in which an unannounced entry could be reasonable: (1) when there is a threat of physical violence to the officers; (2) when it is necessary to apprehend an escaped prisoner; or (3) when officers have reason to believe that evidence would be destroyed. *Id.* at 936. In *Richards,* the Supreme Court largely repeated the situations that it identified in *Wilson*, noting that "[i]n order to justify a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Richards*, 520 U.S. at 394. In *United States v. Banks*, 540 U.S. 31 (2003), the Court described the knock and announce rule as one of a class of "factual considerations of unusual, albeit not dispositive, significance" to the reasonableness inquiry. *Id.* at 36. *Banks* reaffirmed that "[t]he standard for a no-knock entry stated in *Richards* applies on reasonable suspicion of exigency or futility." *Id.* at 37 n.3. The Court went on to explore a no-knock entry based on exigency without considering the futility exception. *Id.*

## B. Fourth Amendment Violation

### 1.

The parties focus most of their attention on one issue: the agents' failure to knock and announce their presence and intentions before entering the house.[5] Simply stated, the parties dispute whether the agents knocked and announced their presence, whether Belter saw them as they approached and whether the agents or an occupant of the home opened the door. This factual dispute ordinarily would preclude a grant of summary judgement. *See Sledd v. Lindsay*, 102 F.3d 282, 288 (7th Cir. 1996). However, the State argues that, even assuming a failure to knock and announce, summary judgment to the agents was appropriate because their failure was excused.

We adhere to the principle that we must view the facts in a light most favorable to Mr. Green and Ms. Poulsen. There is evidence supporting the plaintiffs' version of events, and we therefore must assume that the agents entered the home without knocking or announcing their presence and purpose, and, thus, that they failed to comply with the knock and announce rule. Moreover, we must accept that Mr. Green did not know the identity of the agents, and that Belter did not see them or invite

---

[5] Mr. Green and Ms. Poulsen raised the no-knock argument in their opposition to the State's motion for summary judgment, but the district court did not explicitly address it. Instead, the district court balanced the plaintiffs' privacy interests with the State's interest in an overall reasonableness analysis, focusing on Belter's consent and the "special needs" inherent in monitoring parolees.

them into the home before their entry.[6]

The State first argues that the agents' failure to comply with the knock and announce rule should be excused. However, the factors justifying a no-knock entry identified in *Wilson*, *Richards* and *Banks* largely are inapplicable to this case.[7] The agents here were not, for example, in pursuit of an escaped prisoner. Moreover, consistent with the discussion in *Banks*, our cases have focused upon exceptions to the knock and announce principle based on an exigency, such as manifest danger to the officers or others. *See Leaf v. Shelnutt*, 400 F.3d 1070, 1084-85 (7th Cir. 2005); *see also United States v. Gillaum*, 372 F.3d 848, 854 (7th Cir. 2004) ("Absent exigent circumstances, law enforcement officers must knock on the entry door of a dwelling and 'announce their identity and intention before attempting forcible entry.'" (quoting *United States v. Espinoza*, 256 F.3d 718, 723 (7th Cir. 2001))). It is possible that, in a situation such as the one at issue here, the agents reasonably could have sus-

---

[6] Because it ultimately does not affect the outcome of this case, we assume that the agents' alleged actions would not be a violation of the knock and announce rule if co-occupant Belter knew of the agents' presence or otherwise indicated his consent before they entered.

[7] The agents did not break the door, but entering without permission constituted a "forcible entry" for purposes of the knock and announce rule. *See Sabbath v. United States*, 391 U.S. 585, 589-91 (1968) (construing the phrase "break open" in the federal knock and announce statute, 18 U.S.C. § 3109, to include opening a closed but unlocked door); *Leaf v. Shelnutt*, 400 F.3d 1070, 1082 n.12 (7th Cir. 2005) (finding a "breaking" when officers parted blinds to enter an open door); *see also United States v. Antrim*, 389 F.3d 276, 279 (1st Cir. 2004) (analyzing entry as "forcible" though police used key to open the door).

pected an exigency based on Belter's behavior on their first visit of the day—the threat of imminent danger or perhaps of the destruction of evidence—but they do not claim such a justification. Indeed, it is clear that Butler and Bryant did not believe that they faced an exigent circumstance because they allowed Belter to return inside while they left the house for a considerable period to meet with other agents. Moreover, Bryant's notation about the purpose for the agents' return to the home indicated nothing about an imminent threat.

The State thus focuses its attention to the "futility" exception, relying upon cases such as *United States v. McGee*, 280 F.3d 803 (7th Cir. 2002),[8] and arguing that the agents' entry was justified because it would have been futile to knock and announce. According to the State, Mr. Green already had notice that they would return and therefore knew their identities and purpose; knocking and announcing thus would have been futile, a "useless gesture." *Id.* at 807. The State also argues that knocking and announcing would have been "futile" because they reasonably believed that the occupants had been warned of their return and

---

[8] In *United States v. McGee*, 280 F.3d 803, 805 (7th Cir. 2002), an FBI entry team knocked on and then entered through an outer door of McGee's apartment. Approximately ten seconds later, the team broke down an interior door and entered, this time without knocking. Unbeknownst to the entry team, McGee had exited from the rear of the apartment after hearing the first knock and had been apprehended; he thus was not in the apartment when the team actually entered. We rejected McGee's knock and announce challenge, holding that it would have been a "useless gesture" for the agents to knock and announce before entering the inner door when McGee was not in the apartment and thus could not authorize entry. *Id.* at 807.

knew their identities. *See, e.g.*, *United States v. Pelayo-Landero*, 285 F.3d 491, 498 (6th Cir. 2002) (noting that knocking and announcing is a "useless gesture" when the occupant already knows the officer's identity and purpose); *United States v. Kane*, 637 F.2d 974, 978 (3d Cir. 1981) (same).

We cannot accept the State's futility argument. Contrary to the State's submissions, *McGee* is inapplicable to these facts. In *McGee*, we noted that the futility exception applies when "a precipitous entry into a suspect's residence was harmless because that suspect was not home or was not in a position to have ever answered his door." *McGee*, 280 F.3d at 807 (citing *United States v. Barnes*, 195 F.3d 1027, 1029 (8th Cir. 1999)). In other words, the futility exception we articulated in *McGee* renders a failure to knock and announce harmless when the homeowner could not have authorized entry. That is not the case here; indeed, two agents stopped to speak to the owner without identifying themselves, and there was no reason not to knock before entering the home. Moreover, because this is an appeal from a motion for summary judgment, we must view the disputed facts in a light most favorable to Mr. Green. Under this standard, we credit his claim that he did not know the identity of the individuals who approached him and asked for Belter; we must accept as well Belter's view that he did not see the agents approaching before they entered. This is not a situation where the occupant recognized the officers and then sought to bar entry. *See United States v. Peterson*, 353 F.3d 1045, 1049 (9th Cir. 2003). Rather, it is one in which the occupants claim that they did not know the identity of the officers. Accordingly, the State's futility argument is inapposite to the circumstances presented. *See Leaf*, 400 F.3d at 1084 n.17. It would not be reasonable for the agents to believe that, under the circumstances, knocking or announcing their identity and

requesting permission to enter would have been a useless gesture.

The State also argues an exception not mentioned in *Wilson* or its progeny: that Mr. Green consented to the entry by knowingly hosting a parolee, or that he at least tacitly approved the entry by not objecting when the agents approached him in the garage. *See United States v. Ramirez*, 523 U.S. 65, 70 (1998); *Wilson*, 514 U.S. at 934. In a related argument, the State points out that Belter, a resident of the house, had consented to the entry as a condition of his parole, and perhaps Belter also implicitly gave consent if he saw the agents' approach.

We find this consent argument unavailing. It is true that an individual may consent to an officer's entry, thus obviating the need for the officer to announce his presence and purpose. This principle may apply even when the occupant is unaware of the officer's identity, for example, when he responds with "[t]he door is open; come on in" to unknown individuals knocking at his door. *See United States v. Hatfield*, 365 F.3d 332, 340-41 (4th Cir. 2004). But viewing the facts in a light most favorable to Mr. Green, the officers were unknown and uninvited, and their entry was without consent. Nor can it be said that Belter or Mr. Green consented by agreeing to the conditions in the host site agreement. Belter consented to a search at any time; however neither Belter nor the homeowner consented to the activity alleged here: parole agents walking into the house without informing anyone of their identity and purpose.

Indeed, the alleged entry of unknown and uninvited agents presented the very dangers that the knock and announce rule was intended to address, and, contrary to the State's argument, requiring the agents to announce their presence and purpose at the front door, or at least to Mr.

Green, would not "subordinate reasonableness to pure and empty formalism." Appellees' Br. at 20. One purpose of the rule is to protect the privacy of the occupants and to give them an opportunity to prepare for the agents' entry, allowing them "to pull on clothes or get out of bed." *Richards*, 520 U.S. at 393 n.5. Under the circumstances, which presented no exigency, it was an unreasonable invasion of privacy for the officers to fail to afford Belter, Ms. Poulsen or other occupants an opportunity to prepare for their entry. The occupants were given no opportunity to comply with the officers' request.

More importantly, the entry alleged presented significant dangers for the officers, who, in entering unannounced, exposed themselves to the risk that an occupant would mistake their entry for an invasion and reasonably would take defensive measures to protect himself from the perceived, though mistaken, threat. *See United States v. Sargent*, 319 F.3d 4, 8 (1st Cir. 2003); 2 Wayne R. LaFave, Search and Seizure § 4.8(a), at 662-63 (4th ed. 2004). In the same vein, observance of the knock and announce rule is a significant safeguard to the occupants of the home, including innocent third parties for whom the surprise of an unannounced entry by law enforcement officers might elicit panic or other forms of irrational conduct—action that easily can be misapprehended by law enforcement officers and result in deadly defensive measures on their part. *See Sledd*, 102 F.3d at 286.[9] Specific to

---

[9] The danger, and potential tragedy, of escalating violence prompted by mistaken self-defense on the part of police and occupant is illustrated by *Sledd v. Lindsay*, 102 F.3d 282 (7th Cir. 1996). In *Sledd*, the occupant heard police enter, mistook them for

(continued...)

the facts of this case, notice of impending entry might have given the occupants a chance to control the dog, reducing the risk to the agents of an accidental attack or of the need to "shoot" the animal.

In sum, a reasonable officer would not believe that a parolee's consent to submit to search on demand eliminates the need to make such a demand, absent an exigency or demonstrated futility. "None of the elements that have supported dispensing with the knock and announce requirement in our case law exist in the current factual circumstances." *See United States v. Nielson*, __ F.3d __, 2005 WL 1694033, at *5 (10th Cir. 2005).[10]

---

[9] (...continued)
intruders, and retrieved a rifle to defend his home. The officers saw Sledd with the firearm and shot him to death, claiming that their action was justified, though mistaken, self-defense in response to Sledd's mistaken self-defense.

[10] Moreover, in the criminal context, in this circuit, a violation of the knock and announce principle does not result in the exclusion of seized evidence. Rather, we have noted that relief for such violations may be obtained through an action under 42 U.S.C. § 1983 or a *Bivens* action. *United States v. Langford*, 314 F.3d 892, 894-95 (7th Cir. 2002), *cert. denied*, 540 U.S. 1075 (2003). To hold that the conduct alleged here is insufficient to establish such a claim risks making the knock and announce rule itself a useless gesture.

**2.**

Thus, we do not believe that an agent could reasonably believe that any of the State's asserted justifications would excuse his failure to knock and announce. We also are mindful that "[t]he knock and announce principle is but one part of the reasonableness inquiry to be conducted under the Fourth Amendment," *Leaf*, 400 F.3d at 1083, and we therefore must consider the totality of the circumstances, *Wilson*, 514 U.S. at 934. "The Fourth Amendment's flexible requirement of reasonableness should not be read to mandate a rigid rule of announcement that ignores countervailing law-enforcement interests. . . . [T]he common-law principle of announcement was never stated as an inflexible rule requiring announcement under all circumstances." *Id*. The State urges that Belter, and hence Mr. Green and Ms. Poulsen, had a decreased expectation of privacy based on Belter's status as a parolee, and that the agents' actions thus were reasonable when considered in their totality, despite their failure to knock and announce. We have noted that, "[i]n the case of parolees and probationers, th[e] expectation [of privacy] is significantly limited by the supervisory relationship and restrictions imposed on the individual by the State." *United States v. Jones*, 152 F.3d 680, 686 (7th Cir. 1998).

There is a difference, however, between the *reduced* expectation of privacy because one's residence is subject to search on demand and *no* expectation of privacy because the police are free to enter, unannounced, at any time. As the Supreme Court stated in *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987), "[a] probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be 'reasonable.'" Just as "there is no blanket exception to the knock and announce requirement for felony

drug cases," *United States v. Tavares*, 223 F.3d 911, 916 (8th Cir. 2000); *see Richards*, 520 U.S. at 394, there is no blanket exception to the requirement for parolees absent exigency or futility. A parolee who consents to search as a parole condition cannot refuse an officer's request to enter, and the officer is excused from the general requirement that he search only upon warrant supported by probable cause, *Knights*, 534 U.S. at 121, but the officer is not excused from identifying himself. *See United States v. Musa*, 288 F. Supp. 2d 1205, 1208 (D. Kan. 2003) ("The government does not cite, nor did the Court find, cases that extend a probationer's diminished expectation of privacy to elimination of the knock and announce requirement . . . ."), *rev'd on other grounds by United States v. Musa*, 401 F.3d 1208 (10th Cir. 2005).[11]

Considering the totality of circumstances, the parole agents had every opportunity to identify themselves and request entry; they spoke to Mr. Green in the garage but still asked only for Belter's location and commented about Mr. Green's perceived failure to cooperate. They had another opportunity to knock and announce when they reached the front door, but declined to do so. There was no apparent

---

[11] In *United States v. Musa*, 288 F. Supp. 2d 1205, 1208 (D. Kan. 2003), the district court rejected the Government's argument that a probationer's consent to search lowered his expectation of privacy to the point that a no-knock entry was reasonable. On appeal in *United States v. Musa*, 401 F.3d 1208 (10th Cir. 2005), the court of appeals reversed, on the ground that exigency justified the officer's entry. The United States specifically disclaimed any challenge to the district court's determination that a probationer's blanket consent could eliminate the need to knock and announce. *See id.* at 1217 (Henry, J., dissenting).

exigency, and it is clear that time was not of the essence. Moreover, even if the homeowner expects a visit from parole agents, we do not believe that it would be clear to an individual in Mr. Green's position that a group of people who approach and ask for the resident parolee necessarily are agents of the State, rather than acquaintances or even enemies of the parolee. Nor would it necessarily be clear to the parolee that individuals entering the home are State agents, as opposed to acquaintances or enemies of the host.

In balancing an individual's privacy interests against the State's interests, *Knights*, 534 U.S. at 118-19, we cannot say that the State's interests weigh heavily here. As alleged, there was no exigency justifying a failure to knock and announce, no suspected danger to the officers, to third parties or to the community. Nor was there an apparent risk that evidence would be destroyed that would excuse the agents from identifying themselves. In contrast, the individual privacy interests and the potential risk of mistaken self-defense weigh heavily.

## C. Qualified Immunity

The district court held in the alternative that, even if the parole agents violated Mr. Green's and Ms. Poulsen's Fourth Amendment rights, they were entitled to qualified immunity from suit. Qualified immunity shields the agents from suit unless Mr. Green and Ms. Poulsen can demonstrate (1) "the violation of a constitutional right" that is (2) "clearly established at the time of the alleged violation, so that a reasonable public official would have known that his conduct was unlawful." *Sonnleitner v. York*, 304 F.3d 704, 716 (7th Cir. 2002); *see Saucier v. Katz*, 533 U.S. 194, 200-02 (2001); *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987). As

discussed above, the plaintiffs have met their first-prong burden by demonstrating, at least at this stage of the proceedings, the violation of a constitutional right.

We thus address here only the second prong of qualified immunity analysis. As above, we consider the facts in a light most favorable to Mr. Green and Ms. Poulsen, *McGreal v. Ostrov*, 368 F.3d 657, 682 (7th Cir. 2004), and ask whether the plaintiffs have demonstrated that, in 2003, reasonable parole agents would have known that entering the home without announcing their identity and purpose would be unlawful. To meet their burden, Mr. Green and Ms. Poulsen "may point to closely analogous cases demonstrating that the conduct is unlawful or demonstrate that the violation is so obvious that a reasonable state actor would know that what he is doing violates the Constitution." *Id.* at 683.

Mr. Green and Ms. Poulsen point to two cases, in addition to the Supreme Court's decision in *Richards*, to support their position. In *Sledd*, 102 F.3d 282, we held that officers were not entitled to invoke qualified immunity at the summary judgment stage because, viewing the evidence in a light most favorable to the plaintiff, the officers' actions were objectively unreasonable. The "unreasonable" actions in *Sledd* included allegations that the officers failed to knock and announce and then improperly used deadly force on the occupant once they entered. Mr. Green and Ms. Poulsen also point out that, in 2000, we described the knock and announce requirement as "well-established" and indicated only two exceptions: where there is a threat of physical violence or potential destruction of evidence. *Jacobs v. City of Chicago*, 215 F.3d 758, 770 n.5 (7th Cir. 2000). The State counters that neither *Sledd* nor *Jacobs* is entirely apposite to the circumstances here and therefore argues that Mr. Green and Ms. Poulsen have failed to meet their burden.

The State is correct that *Sledd* and *Jacobs* are not "on all fours" with the case before us. *See McGreal*, 368 F.3d at 683. However, the second qualified immunity prong is not "predicated upon the existence of a prior case that is directly on point. The question is whether a reasonable state actor would have known that his actions . . . were unlawful." *Nabozny v. Podlesny*, 92 F.3d 446, 456 (7th Cir. 1996) (citation omitted). "Although earlier cases involving fundamentally similar facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (internal quotation marks omitted). Fourth Amendment inquiries are fact-intensive. However, as the Supreme Court emphasized in *Hope*, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* "The salient question is not whether there is a prior case on all fours with the current claim but whether the state of the law at the relevant time gave the defendants fair warning that their treatment of the plaintiff was unconstitutional." *McGreal*, 368 F.3d at 683. Considering the facts of this case in a light favorable to the plaintiffs, we believe that Mr. Green and Ms. Poulsen have met their burden.

Of prime importance to our conclusion is the work of the Supreme Court of the United States. By 2003, the Supreme Court had affirmed, and had re-affirmed, the importance of the knock and announce rule in Fourth Amendment reasonableness inquiries. *Richards*, 520 U.S. 385; *Wilson*, 514 U.S. 927. *Richards* and *Wilson* made clear that no-knock entries would be reasonable only in cases of exigency or futility. Cases interpreting the futility exception established, at most, that knocking and announcing would be futile if the occupant consented to entry, or was not there to

consent to entry, or recognized the officers and attempted to bar their entry. In addition, by 2003, the Supreme Court had recognized, in no uncertain terms, that a parolee's home is protected by the Fourth Amendment "like anyone else's." *Griffin*, 483 U.S. 868. The Court also had rejected blanket exceptions to the knock and announce rule in *Richards*. *See* 520 U.S. at 391-95.

In short, at the time of the incident at issue here, a reasonable agent would have known that a critical component of a reasonable entry under the Fourth Amendment was the knock and announce requirement. There was no reason for an agent to believe, under these facts, that dispensing with the requirement was justified by any exigency or futility. Nor was there any basis for a belief that the parolee's consent to search justified dispensing entirely with the knock and announce rule. Indeed, when an officer enters a home without knocking and announcing his identity and purpose, and without a manifest exigency or demonstration that compliance would be futile, the Fourth Amendment violation "is so obvious that a reasonable state actor would know that what he is doing violates the Constitution." *McGreal*, 368 F.3d at 683.

It may turn out, after the facts are fully developed, that the parole agents here *did* knock and announce their presence, or that Belter saw and recognized them before their entry, or that an occupant of the home actually allowed them to enter. But these are disputed issues of fact. "Given the significance of the disputed issues of fact here, qualified immunity from *suit* is effectively unavailable, even though after a full trial the officers may yet prevail on the merits." *Sledd*, 102 F.3d at 288 (emphasis in original).

## Conclusion

For the foregoing reasons, disputed issues of material fact remain and the parole agents are not, at this stage, entitled to qualified immunity from suit. We therefore reverse the grant of summary judgment to the agents and remand for further proceedings. The plaintiffs may recover their costs in this appeal.

REVERSED and REMANDED

A true Copy:

Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*